**In the Interest of Penny Annie Helen HOCHMUTH et al.**

**Appeal of Joyce HOCHMUTH.**

**No. 3–59244.**

Supreme Court of Iowa.

March 16, 1977.

 

Bertram B. Metcalf, Davenport, for appellant.

Richard C. Turner, Atty. Gen., Theodore R. Boecker, Asst. Atty. Gen., and Thomas G. Schebler, Asst. County Atty., for the State.

J. Michael Hobert, Davenport, for the minor children.

Heard by MOORE, C. J., and MASON, RAWLINGS, LeGRAND and UHLENHOPP, JJ.

LeGRAND, Justice.

This is an action brought under § 232.-41(2), (b) and (d), The Code, 1973, to terminate the parental rights of Wayne Hochmuth and Joyce Hochmuth to their three minor children, Penny, Joseph and Timothy. The juvenile court ordered the rights of the parents terminated. We affirm.

Wayne does not appeal, and the order of termination is final as to him. We discuss this case on appeal as though Joyce were the sole parent involved.

I. At the time of the hearing, Joyce was 36 years old. She and Wayne had then been divorced almost three years. Penny was 9 years old, Joseph was 6 years old, and Timothy was 4 years old. Joyce has been married five times. Wayne was her fourth husband. After her divorce from Wayne, she married again but that marriage, too, had ended in divorce before the time of hearing in this case.

The transcript of evidence covers 586 pages. Much of it is devoted to a detailed description of the stormy marital life of Joyce and Wayne with its inevitable adverse effect on the children. Although Wayne is not a party to this appeal, and although only Joyce's parental rights are concerned, our discussion involves him as much as her because the testimony shows conclusively Wayne was, and remains, a disturbing influence in Joyce's ability to manage her life, her home, and her children. Her continuing destructive relationship with Wayne, with its accompanying fighting and violence, has caused her to lose jobs and to be evicted from several places

of residence. It has also caused her physical harm and emotional trauma.

Joyce and Wayne each came from homes in which one or both parents were alcoholics. Both of them admit they, too, are alcoholics. There is evidence that Wayne first became intoxicated at the age of seven. He has been drinking intoxicating liquor ever since with only rare periods of abstinence. Joyce first began drinking intoxicants when she was thirteen. She has continued to do so ever since although she has made determined, though futile, efforts to stop.

Both have been convicted of criminal offenses and have spent time in penal institutions. Both, too, have been patients in institutions for the treatment of alcoholism. Within the past ten years, Joyce has been attended for alcoholism in Oakdale Sanitarium, Scott County Mental Health Center, Mercy Hospital, St. Anthony's Hospital, Alcoholism Treatment Center at Mt. Pleasant State Hospital, East Moline (Illinois) State Hospital, Rock Island (Illinois) Mental Health Center at Franciscan Hospital, and Bethany Home. She has also sought help from Alcoholics Anonymous and marriage counseling from Family and Children's Services in Davenport, Iowa. By her own admission she has been unable to conquer her alcoholism for any extended period.

Most of the testimony was from social workers who have been assigned to the Hochmuth case over the years. Perhaps the most important evidence, however, came from Dr. Rip O'Keefe, a psychologist and director of the Alcoholic Treatment Program at Franciscan Hospital in Rock Island, Illinois, where Joyce was a patient for an extended period. Dr. O'Keefe's association with Joyce extended over thirty to forty treatment sessions covering three or four months. Some sessions lasted as long as an hour, some less. Thereafter Joyce was employed by Dr. O'Keefe at the Alcoholic Center but that employment was terminated after a few months by what he called "mutual consent."

Dr. O'Keefe (and several of the other witnesses as well) emphasized the part which Wayne continued to play in Joyce's life even after their divorce. According to Dr. O'Keefe there is little hope for her rehabilitation as long as Wayne intrudes on the scene. They are, according to this witness, "bad for each other." Joyce says Wayne forces his presence upon her against her will. Other evidence suggests otherwise. Certainly they enjoy drinking together. Their whole relationship—before, during and after marriage—has been premised on that common interest.

When Wayne is around, it is apparently impossible for Joyce to stay away from liquor. Inevitably, they end up, as they always have, on an uncontrolled drinking spree. Inevitably, too, this terminates in violence. From time to time Wayne has caused serious personal injury to Joyce. These episodes include one stabbing incident; a broken nose; a broken eardrum; and lacerations about the head and face. Once he hit her so hard her teeth went through both her upper and lower lips. Several of these beatings have resulted in hospitalization for as long as ten days. Some of this violence took place in front of the children.

In spite of this history, Wayne continues to seek her out from time to time, probably when he feels the need of a drinking companion. She confesses she is unable to stand up to him and that he bullies her now, just as he did when they were married. Wayne did not testify, and these charges are unrefuted.

Virtually all of the witnesses describe Joyce as a warm, affectionate, likeable person. She is honest, forthright and has great affection for her children. She has the ability to be an outstanding parent—when she is sober.

These same witnesses, however, say that when Joyce is drinking everything is subordinated to her passion for liquor. Her home, ordinarily neat and clean, then becomes a shambles. Her children are neglected and left to fend for themselves. They are dirty and do not have proper clothing. Sometimes they are without food. On occasion Penny, the oldest, was left to

mother the two younger ones, although she herself was then only five or six years old. According to Dr. O'Keefe, when Joyce is drinking, she is demanding, hostile, aggressive, belligerent and combative.

Eventually the very persons who had high hopes for her ultimate rehabilitation became the most pessimistic about her chances. Dr. O'Keefe, for instance, first felt that Joyce would rehabilitate herself. He now says her chances for recovery are "minimal." He bases this on the duration of her habit and the fact that even when not drinking she does not lead a productive life. She has over the years been unable to hold employment and has been moved from house to house. Occasionally she has no place to live and is reduced to moving in with friends. According to Dr. O'Keefe, she is always "just waiting for the next drunk." He points to her continued relationship with Wayne as being one of the reasons she can't arrange her own life.

One social worker expressed the opinion that when Joyce was sober she was "a remarkable mother." She also testified she did not believe parental rights should be terminated. The other witnesses disagreed with her.

While testifying, Joyce freely admitted there were times when she felt unable to care for her children. On several occasions she voluntarily placed them with the Board of Social Welfare for foster home care. She said she did so because she was "a mental wreck." Now she says she has recovered and feels certain she can do a good job with them. However, she was honest enough to admit that she was not certain she had beaten the drinking habit. At the time of hearing, she conceded she had been drinking within the past six weeks but not heavily "except on occasion." She admitted, too, that her heavy drinking resulted in some unfortunate experiences for the children.

During 1975 Penny and Joseph each attended six different schools. Both of them have learning and emotional problems. Penny is described as a bright, spontaneous and inquisitive child but one who is functioning, both academically and socially, on a lower level than average for a child of her age.

Joseph, who was in second grade at the time of hearing, was also functioning academically and socially far below what would be considered average for a child of his age. Joseph has a rather serious speech defect for which he was receiving special speech therapy. He also is encopretic, a condition diagnosed as emotional rather than physiological.

Timothy, the youngest of the three children, has a speech problem for which he was receiving speech therapy.

From 1970 until the 1975 hearing, there were ten or eleven separate periods of temporary placement for these children, some voluntary, some not. During that period they spent 31 months in foster homes.

The foregoing is the factual basis upon which the juvenile court terminated the parental rights of both parents.

II. We set out the statutory provisions under which this action was brought (§ 232.41(2)(b) and (d)):

"The court may upon petition terminate the relationship between parent and child:

"1. * * *

"2. If the court finds that one or more of the following conditions exist:

"(a) * * *

"(b) That the parents have substantially and continuously or repeatedly refused to give the child necessary parental care and protection.

"(c) * * *

"(d) That the parents are unfit by reasons of debauchery, intoxication, habitual use of narcotic drugs, repeated lewd and lascivious behavior, or other conduct found by the court likely to be detrimental to the physical or mental health or morals of the child;

"(e) * * * "

Joyce raises the following propositions for reversal:

1. The evidence is insufficient to justify termination of her parental rights;

2. The trial court erred in admitting the testimony of Dr. O'Keefe;

3. The trial court erred in admitting over proper objection a release signed by Joyce Hochmuth authorizing Dr. O'Keefe to divulge information concerning her condition and treatment;

4. The trial court erred in overruling Joyce's motion for a new trial which was based on constitutional grounds.

III. Before discussing the issues raised and our reasons for affirming the juvenile court, we should review the recent decision in *Alsager v. District Court of Polk County*, 545 F.2d 1137 (8th Cir. 1976), holding these same statutory provisions to be unconstitutional as there applied. The Circuit Court of Appeals affirmed the district court opinion reported at 406 F.Supp. 10 (S.D.Iowa 1975) on the ground the Alsagers had been denied both substantive and procedural due process in violation of the 14th Amendment to the United States Constitution, but then went on to say:

> "Other issues reached by the district court, *viz.*, the vagueness and overbreadth attacks upon the facial validity of *Code of Iowa* § 232.41(2)(b) and (d), 406 F.Supp. at 17–21 and 24, and the appropriate standard of proof at a parental termination hearing, 406 F.Supp. at 25, need not now be resolved in order to effect a plenary disposition of the present controversy between the parties, and we do not reach such issues. *See Garner v. Louisiana*, 368 U.S. 157, 162, 82 S.Ct. 248, 7 L.Ed.2d 207 (1961). (545 F.2d 1137)
> "Although we decline to resolve whether the statutory provisions cited above are facially unconstitutional, as alternatively held by the district court, we cannot refrain from noting, at minimum, that both the vagueness and overbreadth attacks upon these provisions are serious ones. By declining to affirm on these grounds, however, we afford the Iowa courts an additional opportunity to give the statutory provisions a plainly desirable limiting construction. *See Grayned v. City of Rockford*, 408 U.S. 104, 111–12, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)." (545 F.2d 1138)

In view of the pointed suggestion in *Alsager*, we should re-examine § 232.41(2) to determine if the proceedings in the case now before us are vulnerable to the objections urged there.

We are told we should not do so because the constitutional objections have not been properly preserved. For reasons stated later, we reject that argument on the issue of vagueness. We agree no other constitutional claim was asserted. We limit our consideration accordingly, and we dispose of that issue first.

During the trial itself, no attack was made on the proceedings for constitutional reasons. After the conclusion of the trial on October 9, 1975, and before the trial court's ruling was filed (January 9, 1976), the district court *Alsager* opinion was filed (406 F.Supp. 10). Subsequent to that date Joyce filed a motion for new trial. Even there she set out no constitutional grounds. However, at oral argument on the motion, the vagueness of the statute was raised and vigorously argued. The *Alsager* opinion was relied on as authority for a new trial. The issue was considered by the juvenile court and ruled on adversely.

While we might well refuse to consider this constitutional issue under these circumstances, we do not choose to do so. We therefore review the matter on the only ground urged by Joyce—the vagueness of the statute.

As already noted, the opinion of the 8th Circuit did not reach the issue of vagueness. It did, however, point out the gravity of the claims made and afforded us "an additional opportunity to give the statutory provisions a plainly desirable limiting construction."

We hold the present case is not subject to the objections as to vagueness which the federal courts found so disturbing in *Alsager*.

■ Both the district court and the 8th Circuit agree a statute otherwise unconsti-

tutional because of vagueness may be salvaged by a limiting interpretation which brings the application of the statute within constitutional bounds. We quote from the district court opinion:

"The Iowa Supreme Court's failure to cure the vagueness defects of section 231.41, either through a general narrowing construction in prior cases, or by a specific narrowing construction in the Alsagers' own case, leads this Court to conclude that Alsagers were denied Due Process. * * * In the absence of a showing that the plaintiffs violated a permissibly specific termination standard, their parental termination constitutes a denial of Due Process." (406 F.Supp. 21)

The court also said at 406 F.Supp. 19: "Although the Court has found the Iowa parental termination standards of 'necessary parental care and protection,' * * * and of '[parental] conduct * * * detrimental to the physical or mental health or morals of the child,' * * * to be unconstitutionally vague, this determination in terms of the facial defects of the statute is not necessarily fatal; the Court must next determine whether this vagueness has been cured, either generally, by the Iowa Supreme Court's decisions in other termination cases, or specifically, by the Iowa Supreme Court's opinion in this case. As the United States Supreme Court indicated in Grayned, supra, the defect of an enactment's vagueness can be ameliorated by a state court construction restricting the vague standards to constitutionally permissible bounds. * * Grayned thus suggests that the Iowa standards may be saved from their unconstitutional vagueness if the needed specificity has been supplied by the Iowa Supreme Court."

The statute as applied to Joyce was both specific and precise.

The record shows Joyce was before the juvenile court with reference to her neglect of the children over a period of years. Social welfare workers had been assigned to help her since at least 1970, five years before the termination hearing.

In January, 1975, the juvenile court approved an ultimatum given Joyce setting out the conditions she must meet to avoid termination of her parental rights. This was nine months before the termination proceedings. We set out those conditions:

1. Maintain sobriety;

2. Resolve what her relationship with Wayne will be;

3. Indicate stability by maintaining a place to live for a period of months;

4. Continue regular visitation with children;

5. Retain employment.

These conditions were communicated and explained to Joyce both verbally and in writing, which she admits.

She was thus provided with definite information as to the particular complaints against her and as to what conduct was required in order to avoid a termination of her parental rights. The conditions imposed (with the exception of visitation with the children) went to the very things which had been most important in preventing her from performing her parental responsibilities.

■ We hold § 232.41(2)(b) and (d) was not impermissibly vague as applied here and that it successfully meets the conditions set out in both *Alsager* opinions. (406 F.Supp. 10 and 545 F.2d 1137).

Before leaving the constitutional issue, we point out why we do not accept the 8th Circuit's invitation to adopt a general limiting construction to § 232.41 or to address the question of quantum of proof to be required in termination cases.

Effective January 1, 1977, our new termination statute (Chapter 1229, § 8, Acts of the 1976 Regular Session of the 66th G.A.) provides the juvenile court shall base its findings and order on the termination of parental rights on clear and convincing proof. The same chapter (§ 38) repeals § 232.41 and sets out new and more detailed grounds for termination. We postpone consideration of the vagueness and overbreadth attacks on the facial validity of the

statute until a proper case is before us on the new statutory scheme.

IV. We still have other issues to meet although they do not raise serious questions.

Joyce claims the evidence was insufficient to terminate her parental rights. We disagree. The evidence is overwhelming that she has not, and probably cannot, afford her children the care, love, and guidance which is essential to their well-being and which the State is obligated to see that they have.

The evidence which we have heretofore detailed presents a consistent pattern of neglect and disregard for the welfare of the children. Any dispassionate reading of the transcript in this case leads to this inescapable conclusion.

The finding of the juvenile court is justified by our previous holdings in *In re Scarlett*, 231 N.W.2d 8, 11–12 (Iowa 1975) and *In Interest of Kester*, 228 N.W.2d 107, 109–111 (Iowa 1975).

In an attempt to accord Joyce every possible consideration, we have reviewed the record on this de novo appeal by applying the clear and convincing test instead of the preponderance of the evidence rule permitted by the statute in effect when this case was tried. We are abidingly satisfied the evidence establishes by clear and convincing evidence that there should be a termination of parental rights.

V. Joyce's claim that Dr. O'Keefe's testimony was erroneously allowed is also without merit. This involves, too, her claim a waiver signed by her should have been excluded.

It appears Dr. O'Keefe objected to testifying unless Joyce would permit him to do so. We assume for our purposes the statutory privilege of § 622.10, The Code, extends to him.

A week before trial Joyce signed a waiver form presented to her by a social welfare caseworker which authorized Dr. O'Keefe to "discuss information concerning me with any judges, attorneys, social workers, etc.

and to release any and all information contained in records to the Family and Children's Service of Davenport, Iowa."

The party entitled to claim privilege under § 622.10 may waive such right. We hold Joyce did so by signing the waiver form referred to. Dr. O'Keefe's testimony concerning his professional relationship with Joyce was admissible.

We hold the order of the juvenile court was correct and it is

AFFIRMED.