**In the Interest of Jay Allen LEWIS, Dawn Marie Ponx and Bobby Ponx, children.**

**State of Iowa ex rel. Carl B. Parks, Director of Court Services, Appellant.**

No. 3–59203.

Supreme Court of Iowa.

Aug. 31, 1977.

Rehearing Denied Oct. 14, 1977.

Richard C. Turner, Atty. Gen., Stephen C. Robinson, Special Asst. Atty. Gen., Bruce W. Foudree and Theodore R. Boecker, Asst. Attys. Gen., William A. Price, Sp. Asst. County Atty., Des Moines, for appellant.

Mark C. Smith, of West Des Moines, for mother.

David L. Phipps, Des Moines, for father.

Glenn E. Pille, Des Moines, Guardian ad Litem.

Heard by MOORE, C. J., and RAWLINGS, REYNOLDSON, HARRIS, and McCORMICK, JJ.

RAWLINGS, Justice.

Juvenile court dismissed dual proceedings for termination of parental rights. Petitioner State appeals and respondent mother cross-appeals. We affirm in part, reverse in part.

September 2, 1975, a petition was filed in Polk County Juvenile Court seeking termination of the parent-child relationship between Barbara Louise and Robert Dean Ponx and three children, Jay Allen Lewis, age 6, Dawn Marie Ponx, age 4, and Robert Dean Ponx, Jr., age 2. Barbara is their natural mother. November 12, 1971, she married Robert Ponx. He is Jay's stepfather and natural father of the two younger children. Lloyd Edward Lee, whom Barbara believed to be Jay's real father, signed a waiver of notice and consent to termination proceedings.

The aforesaid petition alleges that after a January 1974 adjudication of dependency as to Jay and Dawn, Barbara and Robert (respondents), despite social service assistance, failed to correct conditions which had led to

this adjudication. See Section 232.41(2)(e), The Code 1975. The petition also paraphrased § 232.41(2)(b) and (d) in support of a parental right termination as to all three children. December 19, 1975, an amended petition was filed, alleging respondents have "refused and failed to allow themselves and their children to be aided" by a court-directed probation department program. The Ponxes filed objections to the amended petition, but we find no ruling thereon.

December 22, 1975, Barbara challenged the constitutionality of §§ 232.41(2)(b)(d)(e) and 232.46, by amendment to her original answer. Robert raised similar issues by his resistance to the State's attempt to amend the original petition and in his January 9, 1976 amendment to answer.

These questions were again raised by Barbara's close of all evidence motion to dismiss, initially interposed at the first hearing. A request for ruling thereon was not made, however, until one week after entry of judgment on the first petition. This belated motion was overruled.

January 19, 1976, juvenile court held the State had "failed to use reasonable measures to rehabilitate the parents" and dismissed the termination petition. At the same time, Dr. Herbert Notch, clinical psychologist, was directed to provide a comprehensive program designed to rehabilitate the Ponx family. The court also ordered that the children remain in custody of Polk County Department of Social Services until further order.

February 17, 1976, the State gave notice of appeal. The next day Barbara filed notice of cross-appeal. May 26, 1976, this court stayed said appeal pending the filing of a new petition in juvenile court and a decision on the merits in such action.

June 1, 1976, the State initiated a second parent-child termination proceeding in Polk County Juvenile Court. June 7, 1976, Barbara appeared specially, thereby challenging jurisdiction of the court on the basis of alleged constitutional infirmities in the termination statute. June 28, 1976, similar grounds were advanced in support of a motion to dismiss. The special appearance and motion to dismiss were overruled.

The Ponxes also raised constitutional issues by their answers to the second petition. In addition, Barbara filed a post-trial motion to dismiss based on constitutional objections but no ruling was entered thereon.

June 28, 1976, through October 22, 1976, a series of hearings was held on the second termination petition. October 26, 1976, the court again dismissed the action, this time absent any comment as to continuing custody of the children. They have apparently remained in foster homes under department of social services supervision.

November 17, 1976, a second notice of appeal was given by the State. November 22, 1976, a cross-appeal was again taken by Barbara. December 22, 1976, per mutual consent of the parties, this court ordered the cases joined for appellate review.

Disregarding the procedural enigma presented by appeals stemming from two sequential and practically identical causes of action, we now elect, because of the existing singular situation and without precedential force or effect, to treat the cases before us as one proceeding. *Cf. Van Orman v. Merrill,* 27 Iowa 476, 480–482 (1869); Iowa R.Civ.P. 342(e). But see *In re Marriage of Novak,* 220 N.W.2d 592, 596 (Iowa 1974); *McCauley v. Municipal Court of D. M.,* 254 Iowa 1345, 1346–1347, 121 N.W.2d 96 (1963).

Evidence adduced at the hearings below indicates that Ponx household was characterized by filth. Dirty dishes were often left on the table for long periods of time and dog feces on the apartment floor were continually left unattended. A strong smell of urine usually permeated the residence. Although moderately cleaned sporadically, unsanitary conditions soon thereafter prevailed.

There were also indications the children's personal hygiene was repeatedly ignored by respondents. Social workers stated they often found the children unclean and diapers were infrequently changed, resulting in severe rashes. There were reports the Ponx-

es also failed to provide adequate nourishment. Although one witness stated the older children "seemed to have a balanced diet", trial court found "pop, candy and similar food was often the order of the day."

Social workers reported the Ponxes were dilatory in tending to the children's medical needs. Once Barbara stated she did not have time to take the baby to the hospital for treatment of an eye infection. On another occasion, Barbara's brother testified he had to persuade her to take Dawn to the hospital for treatment because of a serious case of pinworms.

Juvenile court found the failure to provide adequate intellectual stimulus and secure emotional environment resulted in poor language development by Jay and Dawn. Test results confirmed such speech problems existed and the children were classified as being in the "low normal" range of intelligence.

There was considerable testimony regarding irrational discipline of the children. Robert admitted having punished Jay with a belt, leaving bruises across his legs. Barbara's brother testified he saw her slap Dawn "[h]arder than I would care for a man to hit me." Barbara was also said to have locked the children in a bedroom and had handcuffed Jay to the bed to keep him from turning on the stove. Even though there were reports of bruises and burn marks on the children, the record does not reveal respondents purposefully inflicted these injuries. Similarly, although references were made to possible sexual molestation of Dawn, there is no showing that respondents engaged in any sexuality with the children. On the other hand, Barbara's brother testified at length regarding repeated raw sex-related talk by Robert Ponx in the children's presence. Additionally, a foster home mother testimonially described the multiple problems created by Jay's unusual sex-simulated conduct, often alone and at times in company with his sister Dawn.

Respondents' personal problems have also contributed to an unhealthy family environment. Although both drink excessively, Robert was said to have made major steps in overcoming this problem. They also had job-related problems, but again Robert seems more aggressive in securing employment. The Ponxes see little hope for the future of their marriage. At time of the final hearings, Robert was living with a woman, pregnant with his child, and Barbara expressed strong doubts as to any reconciliation. Finally, respondents have demonstrated priority problems in money management. The record reveals that during the time agency workers were urging the couple to provide better bedding for the children, the Ponxes were liquidating a $450 veterinary bill for one of their dogs.

Nevertheless, both Barbara and Robert appear to recognize at least some of their shortcomings. Barbara confessed she is "lazy", Robert admitted he is "quick-tempered", and that the children may have been "overly punished" in the past. Respondents also seemingly realize the need for further personal adjustment.

Their efforts toward rehabilitation have met with varied success. Barbara has attended counseling sessions irregularly. A report submitted by Dr. Notch states she has "very little insight into her behavior and, thus, behavioral controls will not be developed autonomously by her." Even so, Dr. Notch opined Barbara might be able to resume parenting within one or two years from date of the last hearing, provided adequate in-home supervision is continued by appropriate agencies.

Robert's attitude was at first termed "threatening and belligerent", but he was reportedly making some corrective progress in this respect at time of the June 28, 1976 hearing. Dr. Notch said Robert had made "some rather major breakthroughs in a period of six months". Because of this progress, the doctor concluded Robert would probably be able to resolve his personal problems and achieve normal parenting skills if given at least one or two years for these possible developments.

As stated above, the two older children were adjudged in January 1974, to be de-

pendent. Their March 25, 1975, extended social services supervision was apparently effected by reason of the court's continuing jurisdiction pursuant to the dependency adjudication. As aforesaid, they have since been in custody of Polk County Department of Social Services. Jay and Dawn have been kept together in a succession of foster homes, but Robert, Jr., has alone seemingly enjoyed a more stable foster care.

Dr. Notch testified the shuffling of these children through several foster homes could have a detrimental effect on their development. On the other hand, he opined there should be "no real problem to their developing * * * to within normal limits" during the one to two year time span required for the parents' possible rehabilitation. He concluded the children would need this period of time for resolving developmental problems regardless of the setting in which they were placed.

October 26, 1976, juvenile court dismissed the State's second petition for termination of parental rights and in so doing stated:

"Dr. Notch testified that it is probable that the program of rehabilitation will be successful; that the time will be one to two years; that prolonged foster care is not conducive to good child growth. The State has not provided a stable home for the children during the period from May 1975 to the present. The children have been subjected to numerous foster home changes. There is no evidence in the record that if termination was granted that the present pattern of frequent foster home changes would be changed.

"Thus the Court is faced with an unknown future if the children are placed with the State contrasted with a likely success of a rehabilitation program of one to two years if the children are left with their parents.

"The State has failed to show that the consequences, in harm to the children, of allowing the parent-child relationship to continue are more severe than the consequences of termination with the State's unknown program of parenting for the children."

These are the issues here raised for appellate review:

(1) The State asserts trial court erred by finding there was insufficient evidence to support a termination of parental rights.

(2) By cross-appeal, Barbara avers trial court erred in:

(a) summarily overruling her special appearance;

(b) overruling her motion to dismiss for failure by the State to allege a cause of action;

(c) failing to declare the Iowa termination statute unconstitutionally vague on its face;

(d) failing to declare the Iowa termination statute unconstitutional as violative of substantive due process;

(e) failing to declare § 232.46 unconstitutional; and

(f) failing to order immediate return of the children to their mother.

The mother's cross-appeal will be first entertained.

I. In support of the position taken by Barbara she has at all times asserted and now postulates:

"That said sub-sections [232.-41(2)(b)(d)(e)] are constitutionally deficient in that they deny both Substantive Due Process and Equal Protection as guaranteed by the 1st, 9th and 14th amendments to the United States Constitution, both on their face and as applied to the instant case in one or more" of ten specified particulars.

Under existing circumstances, no useful purpose will be served by a discussion of the underlying procedural problems presently involved. Rather, we proceed to the substantive matters presented. In so doing this court is not unmindful of the holding in *Alsager v. District Court of Polk Cty., Iowa*, 406 F.Supp. 10 (S.D.Iowa 1975), affirmed in part 545 F.2d 1137 (8th Cir. 1976). Noticeably, however, *Alsager* focused upon subsections (b) and (d) here also invoked by the State. On the other hand, this court presently confines itself to § 232.41(2)(e), The Code 1975, which provided:

"The court may upon petition terminate the relationship between parent and child:

" * * *

"2. If the court finds that one or more of the following conditions exist:

" * * *

"e. That following an adjudication of neglect or dependency, reasonable efforts under the direction of the court have failed to correct the conditions leading to the termination."

The initial question before us is whether said subsection (2)(e) is so deficient facially or as applied that it cannot pass constitutional muster under due process of law, this being the real premise upon which Barbara rests her cross-appeals.

II. As a preface to our consideration of this specific subject, a review of some relevant guiding precepts is deemed appropriate.

"A statute is not unconstitutional on its face unless it is unconstitutional in every conceivable state of facts; it is ordinarily not unconstitutional as applied unless it is unconstitutional as applied in the specific factual situation before the court." *Moorman Mfg. Co. v. Bair,* 254 N.W.2d 737, 755 (Iowa 1977), McCormick, J., concurring specially.

We look next to this apt observation in *State v. Donner,* 243 N.W.2d 850, 853 (Iowa 1976):

"A statute is not vague when the meaning of the words used can be fairly ascertained by reference to similar statutes, other judicial determinations, reference to the common law, to the dictionary, or if the words themselves have a common and generally accepted meaning."

■ Furthermore, while due process of law mandates a statute be not so vague, indefinite or uncertain as to defy an understanding of consequences attendant upon failure to comply therewith, this tenet does not require more specificity than is reasonably possible under the circumstances. *Jordan v. DeGeorge,* 341 U.S. 223, 231, 71 S.Ct.

703, 707, 95 L.Ed. 886 (1951). See also *Horn v. Burns and Roe,* 536 F.2d 251, 254 (8th Cir. 1976); *In re T.,* 9 Cal.App.3d 815, 88 Cal. Rptr. 418, 419 (1970); *Matter of Ladewig,* 34 Ill.App.3d 393, 340 N.E.2d 150, 153 (1975); 16 Am.Jur.2d Constitutional Law, § 552.

■ Despite the fact § 232.41 is not a crime-related enactment, the termination of parental rights is of such a grave nature that contemporary standards attendant upon the evaluation of vagueness in so-called criminal legislation are deemed applicable. See *Jordan v. DeGeorge,* 341 U.S. at 231, 71 S.Ct. at 707–708. But see *United States v. Powell,* 423 U.S. 87, 96 S.Ct. 316, 319, 46 L.Ed.2d 228 (1975); *State v. McMaster,* 259 Or. 291, 486 P.2d 567, 569–570 (1971).

Conceding, arguendo, § 232.41(2)(e), heretofore, quoted, might have been phrased in more precise terms such is not determinative. As previously indicated, the real test is whether the challenged enactment was so vague that men of common intelligence must have necessarily guessed at its meaning and differed as to its application. *Bouie v. City of Columbia,* 378 U.S. 347, 351, 84 S.Ct. 1697, 1701, 12 L.Ed.2d 894 (1964).

Unquestionably, we are here called upon to balance the governmental position involved with private interests of parent and child which may be affected by official action taken. *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972).

■ Of course, best interests of the children is of paramount but not overriding importance. *In re McGlasson,* 195 N.W.2d 116, 118 (Iowa 1972). It is also understood there exists a parental right to integrity of the familial relationship, unless by conduct it be forfeited. *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212–1213, 31 L.Ed.2d 551 (1972); *Long v. Long,* 255 N.W.2d 140 (Iowa 1977). Furthermore, a sovereign is duty bound, as parens patriae, to assure proper treatment of all children within the State. *Long v. Long, supra; Re*

*Interest of Morrison Children v. State,* 259 Iowa 301, 311, 144 N.W.2d 97 (1966). Clearly, these are not competing but rather relative rights and interests.

■ III. This brings us to the alleged unconstitutionality of § 232.41(2)(e).

In brief, it is to us evident this enactment is not unconstitutional in every conceivable state of facts. More specifically, we are satisfied it plainly says that once a child is adjudicated to be dependent or neglected the parent or parents shall devote all reasonable time and efforts to the correction of those conditions upon which the aforesaid adjudication was premised under penalty of forfeiture of parental rights as to such child. And these conditions were explicitly set forth in connection with the January 1974, dependency adjudication. Moreover, the court below aptly found the State had established by clear and convincing evidence that since January 1974, the Ponxes had failed to correct the preexisting inadequate parenting conditions. In fact, it would appear parental rights were not terminated below only because the juvenile court theorized Barbara and Robert were entitled to yet another or third chance. But see *In Interest of Kester,* 228 N.W.2d 107, 110–111 (Iowa 1975).

Admittedly, a fact situation could arise which would make it difficult to determine on which side of the line that particular case might fall, under said subsection (2)(e), but this does not create a vitiating ambiguity in the involved statute. *United States v. Petrillo,* 332 U.S. 1, 7, 67 S.Ct. 1538, 1542, 91 L.Ed. 1877 (1947).

Briefly stated, the ordinary parent should encounter no difficulty in "getting the message" clearly conveyed by § 232.41(2)(e). In any event, it is inconceivable that Barbara and Robert met any such obstacle.

Every constitutional issue presently raised with regard to Jay and Dawn, in connection with § 232.41(2)(e) is devoid of merit. Parenthetically, the cited Act was also constitutional as presently applied. See *Long v. Long, supra,* and *In Interest of Hochmuth,* 251 N.W.2d 484 (Iowa 1977).

IV. Barbara also avers the termination proceedings from which these appeals are taken were fatally deficient because of failure by the State to allege a cause of action.

Any detailed analysis of that assignment will only serve to needlessly extend this opinion.

Cross-appellant (Barbara) foundations the presently claimed deficiency upon her aforesaid facial invalidity of § 232.41 assertion. It therefore follows the instant contention affords her no basis for appellate relief.

Additionally, Barbara's claim to the effect the court below erred in failing to return Jay and Dawn to the parental home is without substance.

In summary, every issue raised by Barbara on cross-appeal has been considered and, as herein delineated, found to be without merit even though not specifically discussed.

V. Next entertained is the State's lone contention that the juvenile court erred in finding there was insufficient evidence upon which to terminate parental rights and thereupon dismissing the proceedings from which these appeals are taken.

■ In the first place, it is to be understood, on this de novo review, we like the court below apply the "clear and convincing proof" standard. See *Long v. Long* and *In Interest of Hochmuth,* both *supra.*

■ At this point a resume of evidence adduced in course of hearings below, heretofore set forth at some length, will suffice for purpose of the moment. It reveals:

The Ponx household was characterized by filth and improper food. The children had been disciplined by being locked in their rooms and one had been handcuffed to a bed. They were frequently left alone in the house and two of them had been observed with bruises or marks which appeared to be cigarette burns. The girl had once been observed with indications of sexual molestation. Both Jay and Dawn had speech problems and gave evidence of being slow learners.

There were indications some medical problems had been long ignored and the children had not always received proper nourishment.

Both Barbara and Robert had drinking problems. They appeared to have trouble maintaining employment. Their marriage disintegrated and was about to be dissolved. The father had at one point lived with another woman and was admittedly the father of a child the other woman was carrying. He announced, but later retracted, a plan to marry his paramour.

None of the presently involved children have been in the Ponx home since May 22, 1975. Since then they have been in custody of Polk County Department of Social Services, which had placed them in various foster homes. Jay and Dawn have been kept together in a succession of foster homes and there repeatedly manifested multiple behavioral problems, some clearly exhibiting loose and demoralizing sex-related conduct or language in the Ponx home.

That factual backdrop prompts reference to this statement in the case of *Long v. Long,* 255 N.W.2d at 143:

"That which has taken place and is likely to occur in the future because of present conditions must be considered. In other words, we are required to determine the long-range as well as immediate interests of the child. In the same vein, this court has observed, parent-child termination proceedings are not like a tort action where injury must be proved before damages may be recovered. Our termination statute is preventive as well as remedial. It mandates action to prevent probable harm to children and does not require delay until after harm has been done. (Citation)."

Under extant conditions it might be argued respondents have at least been minimally responsive to corrective efforts, therefore termination of parental rights should await another day. But this flies in the face of reality. Barbara and Robert Ponx have now had multiple chances to prove their ability to effectively assume parental responsibilities but have clearly failed to satisfactorily respond. Surely Jay and Dawn should not be indefinitely left in a parentless limbo to await the speculative maturity of those who have not, over a period of three or more years, given actual assurance of ever achieving the desired result. By reason of such state of precarious uncertainty this court is persuaded it should not gamble with the future of these two involved minors and that their destiny should not be again indefinitely deferred. See *In Interest of Kester,* 228 N.W.2d at 110–111.

In other words, the State has exhibited the threshold harm necessary to give it a compelling interest, and further adequately established a factual basis for immediate termination of the presently involved parent-child relationship.

Unlike the juvenile court we are satisfied the record before us reveals, by clear and convincing evidence, the parental rights vested in Barbara and Robert Ponx, as to Jay Allen Lewis and Dawn Marie Ponx have been forfeited and under the provisions of Code § 232.41(2)(e) should be and are terminated. To this extent we reverse and remand on both appeals for further appropriate proceedings.

VI. This does not serve, however, to dispose of the appeals regarding Robert Dean Ponx, Jr., the third and youngest child, because he was never prefatorily adjudged dependent. More precisely, the factors which served to make § 232.41(2)(e) constitutional, both facially and as applied with regard to Jay and Dawn, are not instantly applicable.

Additionally, as aforesaid, we take note of the fact subsections (2)(b) and (d) were held to be unconstitutionally vague in *Alsager v. District Court of Polk Cty.,* Iowa, 406 F.Supp. at 17–21, and that the court of appeals 545 F.2d at 1138, said the *Alsager* "vagueness and overbreadth attacks upon these provisions are serious ones."

Under these circumstances, but not without some misgivings as to the welfare of Robert Ponx, Jr. we have no choice but to

affirm, on other grounds, the Polk County Juvenile Court in dismissing the State's petition with regard to this child alone. It is to be understood, however, such affirmance is without prejudice to the State's right to initiate anew any proceeding or proceedings deemed appropriate regarding custodial right as to Robert Dean Ponx, Jr., under any law presently existing or as hereafter amended. In event such new proceeding be not commenced within 90 days from issuance of procedendo upon the present appeals, then and thereupon custody of said minor shall be restored to his parents or such one of them as may be found lawfully entitled thereto. In the interim said minor shall remain under the custodial supervision of Polk County Social Services Department.

Affirmed in part, reversed in part and remanded on both appeals.