**In the Interest of Robert Dean PONX, Jr., a child.**

**Appeal of Barbara Louise PONX.**

**No. 62299.**

Supreme Court of Iowa.

March 21, 1979.

Mark C. Smith, of Stamatelos & Smith, West Des Moines, for appellant.

Thomas J. Miller, Atty. Gen., Stephen C. Robinson and Francis C. Hoyt, Jr., Asst. Attys. Gen., for appellee.

Considered by REYNOLDSON, C. J., and REES, HARRIS, McCORMICK and LARSON, JJ.

LARSON, Justice.

This is the second appeal to this court involving termination of the parent-child relationship between Barbara Louise Ponx and Robert Dean Ponx, Jr., "Bobby," her son. The earlier case, *In re Lewis,* 257 N.W.2d 505 (Iowa 1977), resulted in termination of the parents' rights as to two other children, and in dismissal of the termination petition as to this child because he had not previously been adjudged a "dependent" child as required by the statute under which petitioner sought the terminations. Section 232.41(2)(e), The Code 1975. We said that "[u]nder these circumstances, but not without some misgivings as to the welfare of Robert Ponx, Jr. we have no choice but to affirm, on other grounds, the Polk County Juvenile Court in dismissing the State's petition with regard to this child alone." *Id.* at 512–13. Bobby was to be retained in foster care for ninety days, and if no new action for termination was commenced in that time, he was to be returned to the parents. This action was commenced within that period and resulted in termination of the rights of both parents as to Bobby. The father did not appeal that order. We affirm the juvenile court on the mother's appeal.

Several issues are raised concerning the application of section 600A.8, The Code 1977, to the facts of this case. (Section 600A.8 replaced section 232.41(2), which was in effect at the time of *Lewis.*)

Section 600A.8 provides in relevant part:

The juvenile court shall base its findings and order under section 600A.9 on clear and convincing proof. The following shall be, either separately or jointly, grounds for ordering termination of parental rights:

.　　.　　.　　.　　.

4. A parent has substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed upon that parent by the parent-child relationship.

5. A parent is palpably unfit to be a party to the parent-child relationship because of a consistent pattern of specific conduct before the child or of specific conditions directly relating to the parent-child relationship either of which are determined by the juvenile court to be permanently detrimental to the physical or mental health of the child.

6. If, following an adjudication that the child is in need of assistance under chapter 232, reasonable efforts under the direction of the juvenile court have failed to correct the conditions giving rise to this adjudication.

7. A parent has been ordered to contribute to the support of the child or financially aid in the child's birth and has failed to do so without good cause. This subsection shall not be construed so as to state a grounds for termination of parental rights of a noncustodial parent if that parent has not been ordered to or cannot financially contribute to the support of the child or aid in the child's birth.

The petition alleged grounds for termination under subsections (4), (5) and (7). The juvenile court, in ordering termination, did not specify the grounds relied upon; however, on application of the mother for enlargement of findings under Iowa R.Civ.P. 179(b), it stated that it did not rely upon subsection (7) in making the determination. We therefore limit our consideration here to grounds under subsections (4) and (5).

The mother does not claim any facial constitutional defects in these subsections, but contends they were unconstitutionally applied to the facts of this case. She contends that this application violates (1) the ex post facto clauses of the United States and Iowa Constitutions and (2) constitutes a retrospective application of the statute not intended by the legislature. These objections arise out of the rulings of the juvenile court permitting evidence to be introduced

concerning events predating the effective date of the statute, January 1, 1977.

The petition for termination was filed on November 17, 1977, alleging specific acts and omissions of the parents regarding their care of Bobby. At the hearing, which commenced on January 9, 1978, a voluminous transcript of the 1975 case involving Bobby and two other children *(In re Lewis)* was incorporated into the record by stipulation, the mother reserving appropriate objections on constitutional grounds. When considered as a whole, therefore, there was considerable evidence presented concerning the pre-1977 period, as well as that after January 1, 1977. The juvenile court recited much of the evidence on the conduct before 1977, and clearly relied upon it in entering the order of termination. Before determining the issue of whether the evidence requires a termination, we must decide if such prior matters may properly be considered in the face of appellant's ex post facto and retrospective application objections.

■ I. *The ex post facto claim.* Article 1, section 9 of the United States Constitution and article 1, section 21 of the Iowa Constitution state that no ex post facto law shall be passed. These clauses prohibit application of a "new punitive measure to conduct already consummated where it operates to the detriment or material disadvantage of the accused. Accordingly, a punitive measure is ex post facto if it punishes past conduct which was not criminal when it occurred." *State v. Quanrude,* 222 N.W.2d 467, 469–70 (Iowa 1974). The State contends the rule is not applicable here because the termination statute is not "punitive." Ms. Ponx contends that termination of parental rights is such a serious step that we should invoke this constitutional safeguard even if the statute is not punitive in the traditional sense.

The application of the ex post facto doctrine in Iowa has been limited to cases clearly criminal in nature, *i. e.,* those which provide for fine or imprisonment. *See, e. g., State v. Taggart,* 186 Iowa 247, 172 N.W. 299 (1919); *Quanrude,* 222 N.W.2d at 467.

By contrast, our termination statute has been characterized as "preventive" or "remedial," *Long v. Long,* 255 N.W.2d 140, 143 (Iowa 1977), and as one not intended for "punishment" of the parents. *In re Griffin,* 210 N.W.2d 665, 667 (Iowa 1973).

Although there is historical authority for the application of the ex post facto clauses to civil cases,[1] the prevailing view is that the concept does not apply to noncriminal cases, even though the consequences are of a "serious" nature. *E. g., Lehmann v. United States,* 353 U.S. 685, 77 S.Ct. 1022, 1 L.Ed.2d 1122 (1957) (violation of statute providing for deportation not "penal" for this purpose); *Flemming v. Nestor,* 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960) (termination of social security benefits for conduct legal at the time it occurred did not violate the ex post facto clause). The ex post facto clauses have been held inapplicable to the parental termination statutes of one state because of the civil nature of the proceeding. *In re Ladewig,* 34 Ill.App.3d 393, 398, 340 N.E.2d 150, 154 (App.Ct.1975).

■ We conclude that the ex post facto clauses do not apply; however, even if they were applicable, the termination statute in question would not violate their terms.

■ Whether section 600A.8, The Code, will stand scrutiny under the ex post facto clauses depends upon whether it either (a) applied a new punitive measure to conduct already consummated in such a manner as to operate to the detriment of the parent, or (b) if it increases the "malignancy of or possible penalty for past conduct" even if it was proscribed at the time it occurred. *State v. Quanrude,* 222 N.W.2d 467, 469–70 (Iowa 1974). The "penalty" was not changed under the new act; an adverse determination by the juvenile court resulted in termination under both the old and new statutes. Test (b) is therefore not significant here. However, the juvenile court in entering its order clearly relied upon pre-1977 conduct of the mother as

1. Antieau, 1 Modern Constitutional Law 418 (1969).

well as her conduct from January 1, 1977 to the date of the filing of the petition for termination on November 17, 1977. The pre-1977 conduct was essential to the decision because she did not have custody of Bobby during the period the new statute was in effect; therefore, the only evidence of her actual performance as a parent was before 1977. The issue then becomes: Was this conduct of the mother before the effective date of section 600A.8 proscribed at the time it occurred, or was it first declared to be a basis for termination by the new statute?

Section 232.41 of the 1975 Code, which was the forerunner to section 600A.8, provided, in relevant part, as follows:

The court may upon petition terminate the relationship between parent and child:

. . . . .

2. If the court finds that one or more of the following conditions exist:

. . . . .

b. That the parents have substantially and continuously or repeatedly refused to give the child necessary parental care and protection.

. . . . .

d. That the parents are unfit by reasons of debauchery, intoxication, habitual use of narcotic drugs, repeated lewd and lascivious behavior, or other conduct found by the court likely to be detrimental to the physical or mental health or morals of the child.

e. That following an adjudication of neglect or dependency, reasonable efforts under the direction of the court have failed to correct the conditions leading to the termination.

A review of these sections reveals a marked similarity in language between the provisions of the old and those of the new termination statutes. Ms. Ponx premises her ex post facto argument on the finding of a federal district court that sections 232.-41(2)(b) and (d) were unconstitutionally vague. *Alsager v. District Court,* 406 F.Supp. 10, 17–19, *aff'd on other grounds,* 545 F.2d 1137 (8th Cir. 1976). Since vagueness vitiates the notice of what conduct is proscribed, it is argued that sections 232.-41(2)(b) and (d) did not in fact proscribe her conduct at the time it occurred.

A review of her conduct is helpful to an analysis of her argument. Testimony of several witnesses showed that the mother had been receiving assistance in her parenting responsibilities for several years before Bobby's birth. The mother here had been assisted by professionals in the area of child care for at least five years prior to the filing of the termination petition for Bobby. She and her husband had received services of the Public Health Nursing Association and the Polk County Department of Social Services commencing in 1971. From November, 1971, through May, 1975, the nursing association worked with the Ponx home to assist in providing sanitary surroundings, safety and adequate nourishment, as well as in other areas of child care. Although assistance was continued for several years, no improvement in parenting was observed. The mother was often uncooperative, refusing to answer the door when public assistance personnel arrived. In January, 1974, the older children were removed and placed in protective custody. In September, 1974, when Bobby was slightly over a month old, and several agencies were assisting the Ponx family, the home was observed to be in a filthy and unsanitary condition, reeking of urine, and the baby covered with a heavy blanket full of dog hair, despite stifling heat. In late 1974 and early 1975, the parents became involved with the Des Moines Child Development Center and the Polk County Mental Health Center, but failed to follow the recommendations and missed numerous appointments. In January, 1975, a concentrated 90-day effort was made to assist them in raising the children. A list entitled "expectations for Barbara and Robert Ponx" was furnished. The list contemplated, in part, that the parents would throw away accumulated garbage, wash the dishes, clean the baby's crib, feed the baby milk that was not spoiled, and in a clean bottle, sweep the floors, wipe

up spills, keep the kitchen area and the rest of the house free from human and animal feces, get rid of the urine-soaked mattresses on the children's bed, clean the bathrooms, and get rid of mice, ants, roaches and flies. The list also contained a request that the parents cooperate with the agency worker and public health nurse when they came. The mother was requested to get up before noon, to feed the children regularly, and to get regular medical attention for them, and advised that "I am concerned about all of Bobby's illnesses and his general failure to thrive." Other specific recommendations were made including evaluation of Barbara at a hospital or mental health center. The home conditions continued to deteriorate, and on May 22, 1975, all three children were removed from the home and a petition for termination was filed. This petition was dismissed and an order entered for further intensive efforts to assist the parents. Dr. Herbert Notch, a clinical psychologist, was appointed by the juvenile court to provide a program of services including family and marital counseling, homemaker aid service, public health nurse service, financial counseling and vocational rehabilitation. This order, filed January 19, 1976, provided that the Ponx household be assisted in the following areas, among others:

1. Provide sanitary surrounding. Dog feces shall be immediately removed from the house. Dogs with distemper shall be removed from the house. Dishes shall be washed. Beds shall be made. Floors shall be cleaned. Kitchen cabinets shall be cleaned. Adequate clean bedding shall be on the beds.

Other areas of discipline, nourishment, family counseling and speech therapy for the children were also to be monitored by Dr. Notch, who was to report monthly to the court. Temporary custody was left with the Department of Social Services, and the Polk County Juvenile Probation Department was ordered to provide "monitoring services" to the court. Several public agencies assisted in this effort, but upon conclusion that it had failed, another termination petition was filed on June 1, 1976. That petition was dismissed on October 26, 1976.

This court reversed in *Lewis* and ordered termination as to the other children, but not as to Bobby because of the lack of prior finding of dependency or neglect under subparagraph (e) of the old act as discussed above.

The juvenile court's finding of suicide attempts by the mother, dirty and urine-saturated clothing, filthy living conditions, including accumulations of dog feces in the home and poor dietary care during the period Bobby lived in the home was based on clear and convincing evidence. Photographs of the home, and especially of the beds, showed incredible filth, lending support to the testimony of the social workers, and generating very serious doubts whether any child should be required, or permitted, to live in such conditions.

The conditions in the Ponx home before the filing of the prior termination petition on September 2, 1977, are described in *Lewis,* 257 N.W.2d at 507–08, as follows:

Evidence adduced at the hearings below indicates that Ponx household was characterized by filth. Dirty dishes were often left on the table for long periods of time and dog feces on the apartment floor were continually left unattended. A strong smell of urine usually permeated the residence. Although moderately cleaned sporadically, unsanitary conditions soon thereafter prevailed.

There were also indications the children's personal hygiene was repeatedly ignored by respondents. Social workers stated they often found the children unclean and diapers were infrequently changed, resulting in severe rashes. There were reports the Ponxes also failed to provide adequate nourishment. Although one witness stated the older children "seemed to have a balanced diet", trial court found "pop, candy and similar food was often the order of the day."

Social workers reported the Ponxes were dilatory in tending to the children's medical needs. Once Barbara stated she did not have time to take the baby to the hospital for treatment of an eye infection. On another occasion, Barbara's

brother testified he had to persuade her to take Dawn to the hospital for treatment because of a serious case of pinworms.

There was also evidence at the *Lewis* hearing that there was "failure to provide intellectual stimulus and secure emotional environment" as to the older children, that the mother was lazy and unmotivated as a parent.

Bobby comes to us again, not in the context of subparagraph (e), but upon the basis that his mother had failed in the specific areas in sections 600A.8(4) and (5), The Code 1977. Since the 1976 dismissal of the petition, and up to the filing of the present petition, the evidence shows the mother had failed to even minimally comply with the specific "expectations" which were, in effect, made conditions to avoid termination. She has attempted suicide; she has failed to eliminate the filthy living conditions complained of; she has proven to be unmotivated and unsettled, having at least eight places of residence between October, 1977, and the date of last juvenile court hearings on January 9, 1978. She has openly cohabited with a married man, and has evidenced no intention of changing her lifestyle.

It is true that evidence as to Barbara's performance as a full-time mother is not available for the period following May, 1975, because the children were removed at that time. However, what little evidence there is indicates that her parenting ability has not improved. Weekly visits in the office of the social worker continued from October, 1976, until August, 1977. The mother's attendance there was good. In January, 1977, home visits were arranged on weekends to permit gradual adjustment of Bobby and his mother to possible re-establishment of his custody by her. Bobby came back from his visits smelling of urine, and in the same clothes he was taken in. The in-home visits were terminated in August, 1977, but the office visits continued.

■ Application of sections 600A.8(4) and (5) here would not run afoul of the ex post facto clauses. The performance of this mother, in the care of Bobby, was pro-

scribed prior to January 1, 1977, by section 232.41(2)(b), which provided for termination as to a parent who has "substantially and continuously or repeatedly refused to give the child necessary care and protection."

■ This standard was not vague in its application to Barbara. Subsection (b), when given further elaboration by extensive agency assistance, written items of "expectations," and court-ordered areas of specific improvements to be made clearly has "given the message" to her.

It is true this language is nonspecific, as are the grounds for termination under the new provisions, sections 600A.8(4) and (5). This nonspecificity led the federal district court in *Alsager* to hold the old sections to be vague on their face. 406 F.Supp. at 17–19, *aff'd on other grounds*, 545 F.2d 1137 (8th Cir. 1976). The district court said the statute lacked sufficient specific guidelines for parents to determine whether their performance was within proper perimeters. It said, however, that facial vagueness is not fatal to the application of the statute if the parties sought to be bound by it had been sufficiently advised of its perimeters by other means. Relying upon *Grayned v. City of Rockford,* 408 U.S. 104, 111, 92 S.Ct. 2294, 2300, 33 L.Ed.2d 222, 229 (1972), it said that "the Iowa standards [for termination] may be saved from their unconstitutional vagueness if the needed specificity has been supplied by the Iowa Supreme Court." *Id.* at 19. They noted that this limiting construction could be supplied either "through a general narrowing construction in prior cases or by specific narrowing construction in the Alsager's own case." *Id.* at 21. Therefore, the fundamental defect perceived by the district court was that the "Alsager's were not given fair warning of what was and was not prohibited by the Iowa law. . . . They were not given a factual basis from which to predict how they should modify their past conduct, their 'parenting,' to avoid termination." *Id.* at 20. This district court opinion was affirmed on other grounds, the court specifically noting that "there is no collateral estoppel effect to be afforded the district

court's resolution of [the vagueness] question." *Alsager v. District Court,* 545 F.2d 1137, 1138 (8th Cir. 1976).

The test for determining the constitutionality of the statute is set out in *Lewis:*

"A statute is not unconstitutional on its face unless it is unconstitutional in every conceivable state of facts; it is ordinarily not unconstitutional as applied unless it is unconstitutional as applied in the specific factual situation before the court." *Moorman Mfg. Co. v. Bair,* 254 N.W.2d 737, 755 (Iowa 1977), McCormick, J., concurring specially.

. . . . .

Furthermore, while due process of law mandates a statute be not so vague, indefinite or uncertain as to defy an understanding of consequences attendant upon failure to comply therewith, this tenet does not require more specificity than is reasonably possible under the circumstances. [Authority]

. . . . .

. . . [The fact that a statute] might have been phrased in more precise terms . . . is not determinative. As previously indicated, the real test is whether the challenged enactment was so vague that men of common intelligence must have necessarily guessed at its meaning and differed as to its application.

*Lewis,* 257 N.W.2d at 510.

■ We do not believe that section 232.41(2)(b) is unconstitutional on its face. Specifically, we believe that men of common intelligence would deduce that "necessary parental care and protection" would encompass, at a minimum, providing a clean living environment and proper personal hygiene, health care and diet for the children.

While both the federal district and circuit courts expressed a desire for a limiting construction of the termination statute by an appellate court, we find that the extensive agency and trial court involvement which preceded the termination proceedings, as evidenced by the history of this case, is far more significant in terms of apprising par-

ents of the conduct proscribed. We have recognized this in two earlier opinions involving our termination statute. In *In re Hochmuth,* 251 N.W.2d 484, 489 (Iowa 1977), we held the two subsections of the prior statute were not vague as. there applied, because the juvenile court in prior proceedings had advised the mother what would be required of her in order to keep her children. This was the rationale of the *Lewis* case, also, in applying subsection (e) of the statute to the facts of the case, which provided for termination if the court finds "[t]hat following an adjudication of neglect or dependency, reasonable efforts under the direction of the court have failed to correct the conditions leading to the termination." We said in *Lewis* that "the ordinary parent should encounter no difficulty in 'getting the message' clearly conveyed by section 232.41(2)(e)." 257 N.W.2d at 511.

Ms. Ponx' conduct was therefore proscribed before January 1, 1977, under the old section, as well as by section 600A.8(4) of the new act. The new act would therefore not be unconstitutionally applied to her under the ex post facto clauses, even assuming their applicability here. The statute did not proscribe conduct which was permitted prior to its effective date.

II. *Retroactive application.* The appellant also contends the new termination statute was improperly applied by the juvenile court, in that it was given retrospective effect not intended by the legislature. Appellee counters that the act was "remedial" and thus may be given retrospective as well as prospective effect, under principles discussed in *State ex rel. Turner v. Limbrecht,* 246 N.W.2d 330, 332 (Iowa 1976).

We need not decide whether the act is "remedial" for purposes of deciding this issue. The statute here did not impair rights already vested at the time it became effective, as did the statute in *In re Parson's Estate,* 272 N.W.2d 16 (Iowa 1978). It affected a parent's rights to retain custody—a conditional right in the sense that it could be altered or terminated as conditions dictate. Termination only affects the future rights in the parent-child relationship; it does not operate to affect past rights.

■ The fundamental consideration in termination is what the future holds for the child if he is returned to the custody of his mother. The focus is on the best interests of the child. This is best determined by observing the present conditions and ·the parent's track record. We have said in *In re Freund,* 216 N.W.2d 366, 369 (Iowa 1974), that:

> Determination thereof [of best interests of child] necessarily is based on what is likely to occur in the future because of the present conditions and because of what has occurred in the past.

*See also In re Voeltz,* 271 N.W.2d 719, 723 (Iowa 1978).

We consider the past performance of this mother to gain some insight into the quality of future care likely to be given by her. The statute is applied to the conditions as they were found at the date of the filing of the petition, which was after the effective date of the statute. There is no retrospective application sought for this statute; past conditions are considered for the limited purposes described above—not to establish a time for fixing the rights of the parent. *See Antieau, supra,* at p. 420.

■ Our review of the evidence is de novo. *Voeltz,* 271 N.W.2d at 722; and the proof is required to be "clear and convincing." Section 600A.8, The Code 1977. The evidence here, when viewed under these principles, fully supports the order of termination. We therefore affirm the trial court.

AFFIRMED.