**In the Interest of Randy Ray RICE, a minor.**

**Appeal of Jane BOS.**

**No. 2-58095.**

Supreme Court of Iowa.

Dec. 17, 1975.

Judd Golden, Des Moines, for appellant.

Richard C. Turner, Atty. Gen., and Steve O'Meara, Asst. Atty. Gen., for appellee State of Iowa.

Roger Ferris, Des Moines, for appellee Randy Ray Rice.

Heard by MOORE, C. J., and LeGRAND, REES, REYNOLDSON, and McCORMICK, JJ.

McCORMICK, Justice.

This is an appeal from an order in a child neglect proceeding. After finding Randy Ray Rice to be neglected, the juvenile court ordered him placed in foster care until his mother, Jane Bos, could demonstrate an ability to provide him with proper care. The order contained nine conditions which the mother was required to fulfill before she could expect to regain custody, including a provision that Randy would not be returned to her so long as she remained employed as a masseuse. The sole question in this appeal is whether the court abused its discretion in putting this provision in the decree. We find no abuse of discretion and affirm the juvenile court.

Randy Ray Rice was born February 21, 1974. At that time Jane was separated from her husband Don Rice. Their marriage was dissolved in April 1974. Jane received custody of the child. Randy came to the attention of juvenile authorities when Jane took him successively to several hospitals in September and October 1974, and he was found to have a broken arm. Hospital personnel were suspicious of Jane's explanation of the injury, and the situation was referred to the county department of social services as a case of possible child abuse or neglect.

A petition alleging neglect was filed with the juvenile court on October 25, 1974. It alleged Randy was a neglected child within the meaning of § 232.2(14)(d), The Code, because he was living under conditions injurious to his mental or physical health or welfare. Court officials had trouble finding Jane to serve notice upon her. Finally, on November 26, 1974, she and Randy were found living in the home of her boyfriend Brian Bingaman's parents. Randy was removed from Jane's custody pending hearing.

The neglect petition was heard January 15, 1975. We recite the facts as we find them from our de novo review of the record. Most of them are uncontroverted.

Jane was 19 at the time of the hearing. She testified she had been involved with drugs since she was 14, including marijuana, LSD, amphetamines, and glue-sniffing. She dropped out of high school in her senior year and married Don Rice a few months later, in May 1973. In June he left her and started the dissolution action which resulted in termination of the marriage in April 1974.

Jane held several jobs for short periods before Randy was born. She testified she did not use drugs during her pregnancy. After Randy's birth she went on ADC for a while. Then she became heavily involved with drugs again. She participated in drug parties almost every night, frequently in her own apartment. She said, "We would smoke marijuana and do chemicals". She identified the chemicals as LSD and amphetamines. Randy was present when these events were hosted by her. She acknowledged she did not take proper care of Randy on these occasions.

During the six months before the juvenile hearing, Jane lived about nine different places. She met Brian Bingaman in August 1974. About a week later she and Brian hitchhiked to California with Randy, who was then about seven months old. They soon returned and moved into Brian's parents' home. Brian was unstable and treated Randy badly.

In September 1974, Jane started working as a masseuse at Royal Massage. She had been similarly employed elsewhere for about a month in the past. Her hours were 8:00 p. m. to 8:00 a. m. She left Randy with Brian, Brian's parents, or babysitters while she worked. One of her babysitters was a 15-year-old runaway from the training school at Mitchellville whom she was harboring. The babysitter was also on drugs.

Jane described her duties as a masseuse. She handled outcalls and gave about five kinds of massages at various prices. Her services included giving and receiving nude massages and masturbating her customers.

After giving her employer half her fees, Jane testified she made about $350 a week. She spent up to $80 a day to satisfy her drug habit. As a result she was in debt. She testified that about one-fourth of her fellow employees were also on drugs. She asserted she gave up drugs about three weeks before the neglect hearing but admitted she needed help in order to stay off them.

As a direct consequence of his mother's conduct, Randy was poorly fed, poorly clothed, and poorly supervised.

After adjudicating Randy was a neglected child, the trial court directed that his

custody be in the department of social services for foster care placement until Jane showed her fitness to care for him. The court agreed with a plan for the mother presented by the probation department. It contained seven provisions. Among them were plans for psychiatric counseling, participation in Parents Anonymous, acquisition of a suitable apartment, finding a competent babysitter, cooperation with a volunteer probation officer and public health nurse, prompt communication to the court of any change in circumstances, and regular visitations with Randy. The court added two provisions, one that Jane not be given custody so long as she was living with Brian Bingaman, and the other that she not be given custody so long as she was working as a masseuse.

Jane does not dispute the juvenile court's finding of neglect. The sole purpose of her appeal is to challenge the court's provision that she could not regain custody so long as she worked as a masseuse. She contends her employment as a masseuse does not affect Randy's best interest.

■ Although the record shows Jane has left that employment, she insists she did so under compulsion of the court order. She continues to attack the employment restriction in the juvenile court's order because she wishes to vindicate her right to work as a masseuse without affecting her claim to custody of Randy. In these circumstances, we are unwilling to hold her appeal is moot. See *Hegtvedt v. Prybil*, 223 N.W.2d 186, 188–189 (Iowa 1974). Therefore, we must decide the merits of her contention.

■ The controlling legal principles are well settled. The paramount consideration is the best interest of the child. Several factors are used in assessing parental fitness. They include such parental characteristics as age, character, stability, mental and physical health, the capacity and interest of the parent to provide for the emotional, social, moral, material, and educational needs of the child, and the stability and wholesomeness of the environment offered by the parent. *In re Marriage of Winter*, 223 N.W.2d 165, 166 (Iowa 1974).

Jane argues her employment was lawful and did not adversely affect Randy's health or welfare. She asserts the trial court's order presages adoption of a general principle that masseuses must give up their jobs or lose their children. She labels the order as punitive and accuses the trial judge of attempting to impose his values upon her.

The State says the issue is not whether a masseuse is a fit parent but whether, in the facts of this case, this mother is likely to be a fit parent so long as she is so employed. In resisting Jane's appeal, the State contends her employment did adversely affect Randy's health and welfare, and the judge properly exercised his discretion in requiring that she leave that occupation before she could have her child back. The guardian ad litem agrees with the State's position. So do we.

■ The fact that the employment might be condemned as immoral, and now under an ordinance of Des Moines as illegal, is not controlling. What is determinative is whether the employment adversely affected Randy's best interest in the circumstances of this case.

■ Jane seriously neglected Randy from the time of his birth. She was preoccupied with drug abuse and other selfish pursuits. Her life was aimless. She moved from man to man, from place to place, and from job to job. Randy was the innocent victim of this self-destructive pattern of living. He was denied the proper care and treatment which the State has the duty to assure every child within its borders. *In Interest of Wardle*, 207 N.W.2d 554, 556 (Iowa 1973).

The mother's employment as a masseuse was one phase in this history of neglect. It put her in association with drug-users and gave her money to throw away on drug abuse. She earned this money by subjecting herself to degrading and dehumanizing sexual exploitation. Jane's employment exposed her to all the temptations, opportuni-

ties, and influences which led to her gross neglect of Randy. It brought out the worst in her. Her neglect of Randy proved she could not separate the kind of life she led outside the home from the kind of life she led in the home.

We have said that a wholesome mental and moral atmosphere in the home is essential to the best interests of children. *In Interest of Kester,* 228 N.W.2d 107, 110 (Iowa 1975). We have also rejected the notion that parental character can conveniently be divided into categories of public vice and private virtue. *Smith v. Holt,* 225 N.W.2d 906, 910 (Iowa 1975) (applying the principle to the issue of a father's fitness). No parent can effectively play the role of Dr. Jekyll and Mr. Hyde.

Jane is unstable and immature. Her employment as a masseuse had a detrimental effect on her capacity and willingness to provide Randy with proper care. It fostered her instability and immaturity. It adversely affected Randy's best interest.

We do not agree with Jane's contention that the court's order was punitive or resulted from moral outrage. In entering the order the judge said, "I do not think the matter of placing children is a matter of punishment. Although the activity of * * * [Jane] is offensive to this Court, I don't believe that it is my proper role to, because of my moral indignation, deprive you of your child." The court's purpose was to arrive at a plan by which Jane could stabilize her life and offer a suitable home to Randy.

It was reasonable for the juvenile court to conclude Jane was not likely to improve as a mother until she severed her ties to the environment in which her employment put her. The court did not abuse its discretion in providing she could not regain Randy's custody so long as she continued in that employment.

Affirmed.

All Justices concur except LeGRAND, J., who concurs in the result.