**STATE of Iowa ex rel. Helen LEAS in the Interest of Michelle Ilene O'NEAL, a child.**

**Appeal of Michael O'NEAL and Tina O'Neal.**

**No. 64334.**

Supreme Court of Iowa.

March 18, 1981.

Philip F. Miller, Des Moines, for appellants.

Thomas J. Miller, Atty. Gen., and Brent D. Hege, Asst. Atty. Gen., for appellee.

Considered by HARRIS, P. J., and ALL-BEE, McGIVERIN, LARSON, and SCHULTZ, JJ.

SCHULTZ, Justice.

Michael and Tina O'Neal appeal from a Polk Juvenile Court order terminating their parental rights with respect to their daughter, Michelle Ilene O'Neal. We affirm.

Michael and Tina are the natural parents of Michelle, the child in interest. Michelle, born on April 13, 1978, first came to the attention of the Polk Juvenile Court in June 1978 after the child had been taken to the emergency department of Blank Memorial Hospital because of a thrush condition, a fungal infection of the mouth most common in babies who are generally unhealthy and undernourished. The child was very dirty, pale, looked malnourished, and was experiencing problems with vomiting and diarrhea. On August 1, 1978, Michelle was adjudicated a child in need of assistance under chapter 232, The Code 1977, because she was without proper parental care and needed treatment, which her parents were unable to provide. The juvenile court placed Michelle in the custody of the Polk County Department of Social Services with instructions for the Department to implement a plan under which Michael and Tina could show their ability to provide proper parenting.

On April 6, 1979, after two attempts to arrive at an agreeable plan had failed and the O'Neals had allegedly failed to meet its expectations, the Department filed a peti-

tion to terminate parental rights pursuant to the provisions of chapter 600A, The Code 1977. We have reviewed the record de novo and find that the following evidence was presented at the termination hearing.

Michael and Tina were married to each other twice, the first time in an Indian ceremony when Tina was approximately thirteen years old. They have conceived five children. Michael was absent when the first four children were born. By his own admission he was too "wild" to settle down. He would see Tina approximately twice a year and did not provide financial support for the children other than by sending them money on their birthdays and at Christmas. He has not seen any of these children since 1963 and has no knowledge of their present whereabouts. Michael and Tina separated permanently in 1964 and remained so until they met by happenstance in Des Moines in January 1974.

During the interim Michael remarried twice and fathered four additional children. He does not know the names of these four children and could only guess as to their ages. There was also testimony that Tina remarried and was known as Tonya Levell. She had a son, James Lee Levell, born August 23, 1969. Shortly thereafter Tina was admitted to the Mental Health Institute at Clarinda and diagnosed as having a chronic brain syndrome with convulsive disorder, psychosis with epilepsy. Because Tina was unable, by reason of the mental condition, to provide necessary parental care and protection and the father had abandoned the family, parental rights were terminated by court order filed December 17, 1970. Tina subsequently was at Broadlawns General Hospital, Polk County Home, and Goodwill West, until she walked away from the latter facility on January 22, 1975. She was never apprehended. Tina controverted this testimony contending that Tonya was her identical twin sister. A handwriting analysis expert testified that signatures of Tonya Levell and Tina O'Neal were made by the same person, however, and three other witnesses described and identified Tina as Tonya Levell.

Testimony also revealed that Michael and Tina believed that Tina gave birth to four other children when Michelle was born, and that three had died and one was strangled. The testimony also revealed that they believed Broadlawns Hospital was involved in a conspiracy in which babies were taken out back of the hospital, killed, and placed in plastic bags. Another witness testified that Tina believed physicians at Broadlawns were operating a black-market baby ring. The witness also stated that Tina believed that she had twins when Michelle was born, that errors on the part of the medical staff caused strangulation of her infant son at birth, and that a cover-up prevented these facts from being disclosed to her.

The plan implemented pursuant to the order decreeing Michelle a child in need of assistance required the O'Neals to:

1) Establish and maintain an independent residence adequate for their needs and those of their infant daughter for at least a six-month period.

2) Obtain counseling for budget planning (provided by the Department of Social Service if so desired). The O'Neals maintain they do not require help in this area at the present time but will avail themselves of it in the future if they have need of it.

3) Investigate employment possibilities. . . .

4) Demonstrate their interest in their daughter by maintaining weekly visitation.

Although the O'Neals originally accepted this plan, they subsequently rejected it objecting to the employment requirement. A second plan was then proposed, which was a variation of the initial plan. It incorporated a protective payee and provided for regular counseling for Michael and Tina. The revised plan was also rejected, apparently because the O'Neals objected to the protective payee provision.

The O'Neals reportedly experienced problems with rats and cockroaches in their residence, although there was some indication that this situation had subsided by the time of trial. There was also testimony

that the O'Neals did not possess a refrigerator that was in working condition, and that they did not have an adequate food supply, although Tina testified that she had purchased approximately forty dollars worth of food for Michelle prior to the termination hearing. In addition, the O'Neals failed to keep sixteen of thirty-nine scheduled visits with Michelle.

Dr. Raymond E. Moore, a clinical psychologist, evaluated both Michael and Tina by psychological testing and interviewing pursuant to request by the Department of Social Services. Dr. Moore described Michael as being within the average range of intelligence but that he tended to endorse somewhat far out beliefs. He administered a Wechsler Adult Intelligence Scale, a Rorschach inkblot test, a visual learning test, an auditory learning test, and a Minnesota Multiphasic Personality Inventory to Michael. Michael scored at the ninety-ninth percentile on the sociopathic scale, indicating that he is unsocialized, rebellious toward authority, and may lack inner controls and be careless and insensitive. He also scored at the ninety-ninth percentile on the hypocondriasis scale. People with such a score frequently use health as a cop-out to avoid the pressures and responsibilities of daily life. Michael scored at the fifth percentile on the Baron Ego Strength Scale indicating that he is unresourceful and may have difficulty overcoming obstacles that lie in the path of his goals. Finally, Michael scored at the ninety-ninth percentile on the paranoia scale, indicating that he tends to shift blame to other people, be negativistic, touchy to criticism, and may have delusions of persecution and other thinking disorders.

Dr. Moore testified that Michael's scores were more in line with those of psychiatric patients than normal people, and that the results of the interview were consistent with the test scores. For example, when questioned about his occupation Michael stated that he was disabled because of "bad news" in his back but was unable to explain this alleged malady. Dr. Moore also found Michael's thought process to be disordered and disorganized. For example, Michael

stated that while some people told him he was thirty-four years old he knew this was not accurate because he had a daughter who was twenty-nine years old. In Dr. Moore's judgment Michael was in his early thirties. He concluded that although he had not observed Michael with Michelle, in his opinion Michael was not able to care for his own physical and mental needs and would not be able to adequately provide for the needs of an infant child.

Dr. Moore administered essentially the same tests to Tina that were administered to Michael. She was unable to take the Minnesota Multiphasic Personality Inventory, which requires a sixth grade educational level, however, because she had trouble recognizing the words. Dr. Moore found Tina to be slightly retarded, scoring in the seventh percentile on general intelligence for women her age. On the basis of an interview Dr. Moore found Tina to be mildly depressed and considerably agitated. It was Dr. Moore's opinion that both Michael and Tina needed psychological counseling.

Shahe Zenian, also a clinical psychologist, examined Tina pursuant to court order to determine whether she was mentally competent to assist her attorney in the termination proceeding. His report to the court stated that Tina impressed him "as an emotionally over-reactive individual with very poorly controlled hostility, much surface anger, possible delusional ideational processes, and borderline intelligence."

Kay Shapiro, social worker with the Department of Social Services' Foster Care Unit testified that the O'Neals' financial condition was very precarious—that they frequently did not know where their next meal was coming from. A statement prepared by Ms. Shapiro and introduced into evidence indicated that the O'Neals had exhausted all possible sources of community welfare assistance, that their social security benefits had been cancelled, and that although the Veterans Administration had paid their rent for several months, restrictions had been placed on this aid, and it appeared that the O'Neals might be forced

to move. The exhibit stated that they were obtaining money through donating blood, but were in arrears in their rent and utility payments and viewed the return of Michelle as a means of obtaining regular income through ADC payments. The Department of Social Services had to provide them with bus tokens for nearly all of their visits with Michelle.

Ms. Shapiro expressed concern that the O'Neals would not be able to detect when Michelle was not feeling well or properly care for the child. For example, Ms. Shapiro talked to Michael and Tina about Michelle losing weight when she was in their custody. Both Michael and Tina felt that this was not important because they both had lost considerable amounts of weight as young children. Michael stated that his weight had once decreased from nineteen to three pounds. Ms. Shapiro also stated that the O'Neals have difficulty dealing with their own problems, and when upset tend to focus on themselves rather than Michelle.

In one meeting with Ms. Shapiro the O'Neals were quite upset because Trinity Methodist Church had indicated that it would provide them financial assistance, but when they went back the church said it would not help them because they had been to every other church in the city for assistance. Michael and Tina told Ms. Shapiro that they have look-alikes that ruin everything for them.

Victoria Bruner, a psychiatric social worker, testified that the O'Neals' potential for adequate parenting was extremely low. She stated that the O'Neals were unable to trust anyone, blamed others for things that went wrong, and that it was difficult for them to go beyond anger and seek constructive help. She also stated that on one visit with Michelle, the baby's urine had run down on Tina's boils, and that Tina contended that this had effected a cure.

Ms. Bruner further testified that Tina said her father was one of the original thirteen Hell's Angels, and that Michael and Tina believed that if Michelle were taken away the motorcycle club would come to Des Moines and destroy the entire east side. Ms. Bruner said that on another occasion Tina told her that she would continue to get pregnant until it would kill her. However, Kay Shapiro testified that "Tina claimed she had her tubes tied five times and burned the last time, but that she still became pregnant."

Other evidence established that the O'Neals made no progress whatsoever toward regaining custody of Michelle until approximately one month prior to the termination hearing, when Michael obtained employment with Building Maintenance Services. Prior to that Michael had held two part-time jobs, but they lasted only about four and eight days respectively. He failed to report to work for one of those jobs after cutting his finger and for the other after slamming his finger in a car door. He felt these injuries prevented him from working, but he was unable to find a physician who would certify him for unemployment benefits for either injury.

The O'Neals refused to pursue recommended personal counseling. While they utilized welfare services in the form of financial aid, they refused aid in areas such as counseling, budgeting, and vocational rehabilitation. The O'Neals were requested by their attorney to work with his legal assistant in preparing a budget for the month of February 1979. However, they evidently did not adhere to the budget and were out of money by about mid-month.

The evidence also reveals that Michelle needs special care and attention. While her mental development falls within the normal range, there was a mild lag in her motor development. At the age of nine months Michelle was not sitting up very well, and her foster mother was directed to administer exercises calculated to develop her back muscles. Michelle also had an orthopedic condition, but this was reportedly almost corrected at the time the termination petition was filed. On July 27, 1979, Michelle was hospitalized with gastro-enteritis. Her pediatrician stated that she is susceptible to illness and needs to be closely monitored.

The juvenile court concluded that Michael and Tina O'Neal are palpably unfit to be parents and by order dated October 12, 1979, terminated their parental rights with respect to Michelle. The O'Neals contend that the juvenile court erred: (1) in admitting Dr. Moore's expert testimony over their objection that the physician-patient privilege was applicable and had not been waived; (2) that a proper foundation was not laid for admitting Dr. Moore's testimony; and (3) that the termination of their parental rights is not supported by clear and convincing evidence.

I. *The applicability of the physician-patient privilege.* The petition to terminate parental rights was filed April 6, 1979, under the provisions of chapter 600A, The Code 1977. Section 622.10 provides in pertinent part:

> No ... physician, surgeon, or the stenographer or confidential clerk of any such person, who obtains such information by reason of his employment ... shall be allowed, in giving testimony, to disclose any confidential communication properly entrusted to him in his professional capacity, and necessary and proper to enable him to discharge the functions of his office according to the usual course of practice or discipline. Such prohibition shall not apply to cases where the person in whose favor the same is made waives the rights conferred ....

The O'Neals contend that under this evidentiary standard the testimony of Dr. Raymond Moore was based on privileged communications and therefore inadmissible.

We determine that the physician-patient privilege is not applicable to the communications at issue. We assume, as we did in *In re Hochmuth*, 251 N.W.2d 484, 490 (Iowa 1977), but find it unnecessary to decide whether, a psychologist is a "physician" for purposes of the section 622.10 privilege. *But cf. In re Marriage of Gaumer*, 303 N.W.2d 136, 138 (Iowa 1981) (psychologist not "counselor" within meaning of section 622.10).

The State takes the position that the privilege is not applicable. The State argues that the termination hearing began August 21, 1979, and section 232.96(5), The Code 1979, which became effective July 1, 1979, abrogated the physician-patient privilege and should be applied in the present case. Section 232.96(5) provides: "Neither the privilege attaching to confidential communications between a physician and patient nor the prohibition upon admissibility of communications between husband and wife shall be ground for excluding evidence at an adjudicatory hearing." The physician-patient privilege is thus clearly abrogated with regard to termination proceedings commenced on or after July 1, 1979. The question presented is whether section 232.96(5) should be applied prospectively only or whether it should also be applied retrospectively.

■ "When a statute is newly enacted it may be applied prospectively only or it may be applied both prospectively and retrospectively. Legislative intent determines which of these two applications is to be given." *State ex rel. Turner v. Limbrecht*, 246 N.W.2d 330, 332 (Iowa 1976). The general rule is that a statute will be given prospective application only, unless it appears the legislature clearly intended it to be applied retrospectively. An exception exists, however: when a statute relates solely to a remedy or procedure, it is ordinarily applied both prospectively and retrospectively. But if the statute relates to a substantive right, it is usually only applied prospectively. *Id.*

■ The O'Neals contend that the physician-patient privilege is a substantive right. In support of their position they cite *Woelfling v. Great-West Life Assurance Co.*, 30 Ohio App.2d 211, 220, 285 N.E.2d 61, 68 (1972), in which the Ohio Court of Appeals stated: "The physician-patient privilege is a substantive right and not merely a rule of evidence." We do not agree. In *Wormley v. Hamburg*, 40 Iowa 22, 26 (1874), this court adopted the principle that a statutory rule of evidence applies to a proceeding tried subsequent to its effective date, even though the provision was nonexistent at the time the proceeding was commenced. We have also held that the rules of evidence

governing admission of written memoranda and records are procedural, and the law in effect at the time of trial is to be applied. *Moffitt Building Material Co. v. U. S. Lumber and Supply Co.*, 255 Iowa 765, 768, 124 N.W.2d 134, 136 (1963); *Bingham v. Blunk*, 253 Iowa 1391, 1396, 116 N.W.2d 447, 449 (1962). We find nothing that would so distinguish evidentiary rules governing the admissibility of allegedly privileged communications from those governing written records as to warrant a result different from that in *Moffitt* and *Bingham*. We therefore hold that section 232.96(5), The Code 1979, was applicable to the termination hearing. *Cf.* 68th G.A., 1st Sess. ch. 56, § 31(2)(a)(1) (1979) (codified at § 232.-153(2)(a), The Code 1981) ("Procedural provisions of this chapter shall apply [retrospectively] insofar as they are justly applicable.").

Even if section 232.96(5), The Code 1979, were not applied retrospectively, however, the physician-patient privilege would still not be applicable in this case. A physician is prohibited from testifying about a patient's communications only when they are of a confidential nature, *City of Cherokee v. Aetna Life Insurance Co.*, 215 Iowa 1000, 1006–07, 247 N.W. 495, 497–98 (1933), and related to medical diagnosis or treatment, *State v. Bedel*, 193 N.W.2d 121, 124 (Iowa 1971). Thus, the privilege does not exist if the sole purpose of the examination is to ascertain the patient's mental or physical condition. *State v. Mayhew*, 170 N.W.2d 608, 615 (Iowa 1969). The person seeking to invoke the physician-patient privilege has the burden of proving that the privilege exists. *Allen v. Lindeman*, 259 Iowa 1384, 1391, 148 N.W.2d 610, 615 (1967).

We do not believe that the communications between Dr. Moore and Michael and Tina were intended to be confidential; nor were the communications related to diagnosis or treatment. Dr. Moore's psychological testing and interviews were part of a plan arranged at the request of the Department of Social Services for the purpose of making recommendations that would enable the O'Neals to regain custody of Michelle. It should have been apparent to the O'Neals that the Department would be apprised of the results of their evaluations. Therefore, the O'Neals cannot seriously contend that their communications with Dr. Moore were confidential in nature. Furthermore, the O'Neals' counsel conceded that Moore's examinations were solely for the purpose of evaluation, as opposed to diagnosis or treatment, at the termination hearing: "there in fact, was no psychological counseling or treatment whatsoever or attempted."

II. *Was a proper foundation laid for admitting Dr. Moore's testimony?* The O'Neals objected to the admission of Dr. Moore's testimony, contending that an adequate foundation had not been laid. The juvenile court overruled their objection on the basis that the testimony had probative value. We believe that an adequate foundation was laid.

This state adheres to a liberal policy concerning the admissibility of opinion testimony. Such evidence will be admitted if it is of a nature that will aid the jury and is based upon special training, experience, or knowledge with respect to an issue in controversy. *Haumersen v. Ford Motor Co.*, 257 N.W.2d 7, 11 (Iowa 1977). The admissibility of opinion testimony, lay or expert, has not been distilled into distinct rules. Rather, it rests in the sound discretion of the trial court, and the trial court's determination will not be disturbed on appeal unless manifest abuse of that discretion causing prejudice to the complaining party is shown. *Ganrud v. Smith* 206 N.W.2d 311, 314 (Iowa 1973).

The trial court's discretion is not unlimited, however: "Expert testimony is not admissible unless the witness is shown to be qualified and the facts upon which he bases his opinion are sufficient to enable a witness so qualified to express an opinion which is more than a mere conjecture." *Id.* The capacity to testify as an expert is relative to the topic under examination. The witness must be qualified to answer each question propounded. *Tiemeyer v. McIn-*

*tosh*, 176 N.W.2d 819, 824 (Iowa 1970). That is, it is not sufficient that the expert be generally qualified in the area of inquiry; "sufficient data must appear upon which an expert judgment can be made [on the specific question propounded,] and if absent, the opinion is incompetent." *Holmquist v. Volkswagen of America, Inc.*, 261 N.W.2d 516, 524 (Iowa App.1977). Nevertheless, only in clear cases of abuse of discretion will the admission of opinion evidence be found prejudicial. *Haumersen v. Ford Motor Co.*, 257 N.W.2d at 11.

■ The O'Neals contend that the only foundation shown is that Dr. Moore administered some psychological tests. This contention is without merit. Dr. Moore testified that he received "a Bachelor's degree in Psychology from Drake University, Ph.D. in Clinical Psychology from Adelphi University in New York." He served a one-year internship in veterans hospitals in Des Moines and New York, was chief psychologist at the State Psychiatric Hospital in Norwich, Connecticut, worked at the Des Moines Child Guidance Center for two years, taught graduate level psychology courses at Iowa State University for three years and Drake University for two years, was Director of Clinical Psychology at Iowa Methodist Medical Center, and has been associated with Child Psychiatry Associates for the past four years. Dr. Moore also identified the battery of tests administered to Michael and Tina and stated that they would measure most intellectual capacities, problem-solving abilities, *etc.* Furthermore, Dr. Moore gave a short explanation of the tests administered and the results of the tests, often indicating that his opinions were based on in-depth studies.

We find this to be an adequate foundation for the admission of Dr. Moore's testimony. The foundational facts appearing in the transcript of Dr. Moore's testimony establish that he was well qualified through education and experience to administer the tests and to express opinions in answer to the particular questions propounded concerning the results of those tests. Any questions the O'Neals may have had that

were not answered by Dr. Moore's testimony on direct examination concerning the reliability of the tests administered or Dr. Moore's qualifications could have been inquired into on cross-examination. Even though a proper foundation has been laid, an opinion remains an opinion. As such, its credibility is subject to attack, and the trier of fact is at liberty to accept or reject the opinion as it sees fit. *See Haumersen v. Ford Motor Co.*, 257 N.W.2d at 11.

Even if a proper foundation had not been laid, however, the trial court would have been correct in admitting the testimony solely on the basis of its probative value. *See* § 600A.7(2), The Code 1977; *Harter v. State*, 260 Iowa 605, 608, 149 N.W.2d 827, 829 (1967).

III. *Is the juvenile court's order terminating the O'Neals' parental rights supported by clear and convincing evidence?* The parental rights involved were terminated under the authority of section 600A.8(5), The Code 1977, which provides:

A parent is palpably unfit to be a party to the parent-child relationship because of a consistent pattern of specific conduct before the child or of specific conditions directly relating to the parent-child relationship either of which are determined by the juvenile court to be permanently detrimental to the physical or mental health of the child.

In a carefully drawn and detailed statement of its findings of fact and conclusions of law, the juvenile court stated:

Utilization of the parens patriae theory leads to the inescapable conclusion that the evident harm likely to be bestowed upon this child by the O'Neals precludes their rights as parents.

By virtue of the totality of the evidence it is apparent to this court that their mental problems, their psychological problems, their early years and childhood, their low frustrated functioning level render the O'Neals incapable of performing and complying with the duties and obligations attending parenthood. Each needs supportive services to function as a parent. This is an impossibility because

they individually escalate each other's problems. The court agrees with one of the witness's statements that Michelle would, in the parents' home, undergo an inconsistent and chaotic life with resultant harm to the child's health and mental welfare. Their ability to render important decisions concerning Michelle's life and welfare is deemed insufficient.

The court does therefore conclude that Michael and Tina O'Neal are incapable of performing the eleven listed essentials hereinbefore set forth.

The court further finds and concludes that the allegations of the petition, by clear and convincing evidence, have been sustained.

The court additionally concludes that Michael and Tina O'Neal are palpably unfit to be a party to the parent-child relationship and which are deemed permanently detrimental to Michelle O'Neal's physical and mental health as pled in No. 19 of the petition.

In a de novo review it is our duty to review the facts as well as the law and adjudicate rights anew on those propositions properly preserved and presented to us. *In re Wardle*, 207 N.W.2d 554, 557 (Iowa 1973).

The grounds for termination of parental rights must be shown by clear and convincing proof. § 600A.8, The Code 1977. The paramount consideration is the best interests of the child, but there are several other factors that are used in assessing parental fitness, such as age, character, stability, mental and physical health, the capacity and interest of the parent to provide for the emotional, social, moral, material, and educational needs of the child, and the stability and wholesomeness of the environment offered by the parent. *In re Rice*, 236 N.W.2d 40, 43 (Iowa 1975). The parents complain that the trial court should not have relied on Tina's mildly retarded condition. They also contend that the psychological tests were not accurate and question whether there is a meaningful correlation between the tests of the parents' intelligence and the child's potential for emotional and intellectual growth.

Mental disability, standing alone, is not a sufficient reason for the termination of the parent-child relationship, but it is a contributing factor to the inability to perform the duties of a parent. *In re Wardle*, 207 N.W.2d at 563. Thus, mental disability is a proper factor to consider in determining whether a child is neglected to the point where his or her interest and welfare require termination of the parent-child relationship. *Id.*

The O'Neals' test results, although important evidence, were only part of the evidence which indicated a lack of parental ability due to low mental ability. In addition to the test results the record is replete with facts showing that the parents suffered from delusions, lack knowledge of personal health and hygiene, and have a poor understanding of the basic economics necessary to operate a household. These facts affect both parents' abilities to properly care for a child.

The O'Neals assert that poverty alone is not indicative of a person's inherent ability to function in the parent-child relationship. We agree. Economic and cultural advantages are not strong factors unless the parents have the means and ability to provide more, but show no reasonable effort to do so. *See In re Burney*, 259 N.W.2d 322, 324 (Iowa 1977). Therefore, a parent's lack of initiative in securing gainful employment may be considered if it affects the child's welfare.

The juvenile court's order in the child in need of assistance proceeding directing the Department of Social Services to implement a plan to enable the O'Neals to regain custody of Michelle met, at best, with minimal success. This failure was due, in large part, to the O'Neals' refusal to cooperate and their lack of ability. In referring to the past history of the O'Neals and to the rehabilitation efforts, the juvenile court indicated that it would not endanger Michelle's future with such a "track record." It was proper for the court to consider the past

performance of the parents to gain insight into the probable quality of their future parenting. *In re Voeltz*, 271 N.W.2d 719, 723 (Iowa 1978).

It is obvious that the juvenile court was concerned about the future of Michelle. Our termination statute is preventative as well as remedial and does not require delay until after harm has been done. *In re Lewis*, 257 N.W.2d 505, 512 (Iowa 1977).

We conclude that the juvenile court's termination of the parent-child relationship was supported by clear and convincing evidence.

AFFIRMED.