In the Interest of Wallace and Patricia DAMERON, Children.

State of Iowa, Appellant.

No. 65773.

Supreme Court of Iowa.

June 17, 1981.

Thomas J. Miller, Atty. Gen., John G. Black, Sp. Asst. Atty. Gen., Brent D. Hege, Asst. Atty. Gen., for appellant, State of Iowa.

Wayne H. McKinney, Jr., Des Moines, for parents-appellees.

John Wessels, Des Moines, for children.

Considered by REYNOLDSON, C. J., and UHLENHOPP, HARRIS, ALLBEE and LARSON, JJ.

ALLBEE, Justice.

Under review here is the propriety of the Polk County Juvenile Court's order dismissing the State's petition to terminate the parental rights of Wallace Dameron, Jr., and Carol Lynn Dameron. The juvenile court concluded the State had failed to prove by clear and convincing evidence that the parent-child relationships should be terminated. The State, aggrieved by the order, appeals. Our examination of the underlying record convinces us that we must vacate the juvenile court's ruling and order the severance of parental rights.

I. This proceeding was initiated by the State pursuant to section 232.114, The Code 1979,[1] which provides various grounds for the termination of parental rights. The State specifically relies upon subsection 232.114(5), which authorizes termination when:

> 5. The court finds that:
>
> a. The child has been adjudicated a child in need of assistance pursuant to section 232.96; and
>
> b. The custody of the child has been transferred from his or her parents for placement pursuant to section 232.102 for at least twelve months; and

> c. There is clear and convincing evidence that the child cannot be returned to the custody of his or her parents as provided in section 232.102.

The Dameron children, Wallace, Jr., II and Patricia Ann, were previously adjudicated to be in need of assistance. In addition, their custody had been transferred from their parents to the Polk County Department of Social Services for foster care placement; the placement apart from their parents had exceeded twelve months. Hence, the conditions prescribed in subsections 232.114(5)(a) and (b) are satisfied. The determination we must make is therefore reduced to the single but difficult issue of whether the record discloses "clear and convincing evidence that the child[ren] cannot be returned to the custody of [their] parents as provided in section 232.102."[2] § 232.114(5)(c).

The State alleges the Dameron children cannot be returned to the custody of their parents because they will suffer harm due to their parents' failure "to exercise a minimal degree of care in supplying the child[ren] with adequate food, clothing [and] shelter [and refuse] other means made available to provide such essentials." See § 232.2(5)(g).[3] Subsumed in the ultimate issue is the question whether the State adduced clear and convincing evidence that the children will suffer harm if returned to their parents. We also recognize the corollary issue generated by subsection 232.-102(6), namely whether a preponderance of evidence favors returning the children to their parents. See In re Adkins, 298 N.W.2d 273, 278 (Iowa 1980) (noting the burden of proof problem created by the standard mandated in § 232.114(5)(c) vis-a-vis that of § 232.102(6)).

---

1. Now section 232.116, The Code 1981.

2. Pertinent to the determination to be made here, subsection 232.102(6), The Code 1979, provides that placement of a child apart from the parents "should be terminated and the child returned to his or her home if the court finds by a preponderance of the evidence that the child will not suffer harm in the manner specified in section 232.2, subsection 5."

3. Another allegation of the State's petition asserted that the children "have suffered and are imminently likely to suffer harmful effects as a result of conditions created by the children's parents." The State has abandoned this assertion in light of In re Wall, 295 N.W.2d 455 (Iowa 1980).

II. Several previously enunciated principles have served to guide our examination of the record before us. Appellate review of proceedings to terminate a parent-child relationship is de novo; thus "it is our duty to review the facts as well as the law and adjudicate rights anew on those propositions properly preserved and presented to us." *In re O'Neal*, 303 N.W.2d 414, 422 (Iowa 1981). We accord weight to the fact findings of the juvenile court, especially when considering the credibility of the witnesses whom that court heard and observed firsthand, but we are not bound by those findings. *Long v. Long*, 255 N.W.2d 140, 143 (Iowa 1977).

Central to a determination of this nature are the best interests of the child. *Id.* In this connection, we look to the child's long-range as well as immediate interests. Hence, we necessarily consider what the future likely holds for the child if returned to his or her parents. Insight for this determination can be gained from evidence of the parent's past performance, for that performance may be indicative of the quality of the future care that parent is capable of providing. *O'Neal*, 303 N.W.2d at 423; *In re Ponx*, 276 N.W.2d 425, 433 (Iowa 1979).

This court has often recognized that there exists a parental interest in the integrity of the family unit; nonetheless we also are cognizant that this interest is not absolute, but rather may be forfeited by certain parental conduct. *In re Wall*, 295 N.W.2d 455, 457 (Iowa 1980); *In re Voeltz*, 271 N.W.2d 719, 723 (Iowa 1978). Because the State, as *parens patriae*, has the duty to assure that every child within its borders receives proper care and treatment, it must intercede when parents abdicate that responsibility. *Long*, 255 N.W.2d at 143; *In re Yardley*, 260 Iowa 259, 268, 149 N.W.2d 162, 167–68 (1967).

Furthermore, it is our view that the current statutory termination provisions applicable here, like those they replaced, are preventative as well as remedial. The provisions therefore mandate action to prevent probable harm to a child and do not require delay until after harm has occurred.

*O'Neal*, 303 N.W.2d at 423; *In re Kester*, 228 N.W.2d 107, 110 (Iowa 1975).

Finally, as previously noted, the grounds alleged here for the termination of parental rights must by statute be proven by clear and convincing evidence. § 232.-114(5)(c).

III. Turning to the record, it reveals that the Dameron children first came to the attention of authorities in October 1978. On October 10, the children's mother, Carol, was admitted to Broadlawns Medical Center after having been assaulted during a drinking bout. She was subsequently admitted to the ADASI treatment center for detoxification. Personnel at Broadlawns, apparently having learned that Carol had left the children with friends several days earlier, contacted and so advised juvenile court officers. The children were located and found to be in generally good physical condition, although each had diaper rash and Patricia suffered from severe diarrhea. No provision for food and diapers had been made with the persons caring for the children. It was also learned that the children's father, Wallace, was hospitalized at Iowa Lutheran Hospital for a chronic pancreatic problem aggravated by excessive drinking. By juvenile court order, the children were placed in the temporary custody of the Polk County Department of Social Services for the purpose of emergency foster care placement. At the time of these events, Wallace, Jr., II was fourteen months of age and Patricia was two months old.

In December 1978, the children were adjudicated in need of assistance. In an effort to reintegrate the family, however, the children were returned to the physical custody of their parents; legal custody remained with Social Services. The reintegration plan included supportive services and continuing supervision.

Despite support services, supervision and substantial financial aid provided through an ADASI counselor, the Damerons did not fare well during the months that followed. Their life was described as chaotic, replete with marital discord, financial hardship and

mismanagement and alcohol abuse. At times the parents were hostile to, or even resisted, services and supervision. The children, however, were regarded to be adequately cared for and in healthy physical condition.

By May 1, 1979, however, the Dameron family environment had deteriorated to the point where it was deemed necessary to remove the children from the home to protect them from potentially dangerous conditions created by their parents' drunkenness. When taken from their home on May 1, the children were dirty and apparently exhausted. There was a residue of sour milk in Patricia's bottle. Since then, the children have remained in foster care.

Throughout the period between this removal of the children and June 4, 1980, when the petition to terminate parental rights was filed, Social Services personnel invested considerable time and resources in an effort to assist the Dameron parents in establishing conditions into which the children could be safely returned. A contract delineating expectations to be met by the Damerons, with the goal of the children's return, was entered into. The Damerons' performance with respect to those expectations, however, was unsatisfactory.

The parents agreed to accept marriage counseling; they did not follow through, and their marital strife continued. Wallace was to secure and maintain employment in the Des Moines vicinity; the requirement that he work in the Des Moines area was subsequently relaxed to permit him to obtain employment as an over-the-road truck driver, his occupational preference. Nonetheless, he failed to maintain any kind of regular job. Carol was supposed to seek training and employment; she did not. Financial support for their children commensurate with their "interest and income" was a prescribed expectation; no such support was forthcoming. The Damerons were to cooperate with personnel offering services related to the contract goal established for them; their cooperation can be characterized as from superficial at best to nonexistent at times. They were to secure housing which met at least minimal standards of safety and cleanliness, and also to maintain stable residency. While there is little criticism directed to cleanliness, it appears that they moved at least three times during this interim, usually under threat of eviction for failing to pay the rent. Carol was to maintain out-patient alcohol counseling; once again, she did not. Both parents were expected to abstain from alcohol, but neither did. The evidence, in fact, discloses sporadic episodes of heavy drinking by both. Finally, they were to visit their children weekly; they visited the children on only twenty-seven of a possible fifty-four occasions.

In addition to evidence of the Damerons' disregard of the foregoing contractual commitments, the record reflects other disquieting evidence regarding their personal histories and conduct. Each has had prior marriages and other children. Wallace sired eleven children prior to living with Carol. The relevance of this is that he supports none of them. Similarly, Carol gave birth to two children during a prior marriage. The father of those children has their custody and supports them. A third previous child of Carol's, born out of wedlock in 1972, was released for adoption.

Alcohol abuse is a continuing problem for both, permeating all aspects of their lives. It has contributed to marital instability, intensified their financial hardship and affected Wallace's health, and consequently his ability to gain and hold employment. Without question, this also debases the home environment which they as parents have to offer.

The relationship between the Damerons is shown to be volatile. While Wallace and Carol have lived together as husband and wife for more than seven years, and there is no indication that they do not intend to remain together in the future, Carol nonetheless accuses Wallace of beating her and he in turn complains of her drinking and attention to other men. There have been several temporary separations.

The evidence also shows that Wallace spent some time in jail shortly before the

juvenile court hearing in this matter because of what he describes as a misunderstanding with his probation officer. From this revelation it was developed that he has a felony record and was then on probation.

Favorable to the Damerons, persons who provided support services and supervision in the months between December 1978 and May 1979, prior to the children's second removal from their parents' custody, testified that the children appeared to be adequately cared for and that no physical abuse was found. Those witnesses also stated that the children seemed to be happy.

At the time of the hearing on the petition to terminate parental rights, the Dameron parents were residing rent-free in the home of an elderly man who needed someone to stay with him. Carol looked after the man and the house. Wallace testified that for the past month he was employed by the Iowa Truck Driving School, but on closer examination he acknowledged working only three or four days during the month. Both candidly admitted that they lacked resources to feed, clothe and shelter the children if they were immediately returned to them. Both declared a desire to be reunited with their children; Carol testified that is what she wanted "more than anything else." Nonetheless, this lamentable situation is perhaps best capsulized in this question posed to Wallace, and his response:

Q. What have you done since the children were removed to improve yourself and to improve your ability to provide and parent your children?

A. Well, just nothing really, I don't guess, other than got a better understanding, how much you miss them when they are gone, and if you can provide for two, you can provide for four. We got a better understanding, too.

IV. Contrary to the juvenile court, we find there *is* clear and convincing evidence that the Dameron children cannot be returned to their parents. Stated otherwise, the evidence convinces us that the children *will* suffer harm if returned. The parents are unable to minimally supply their children with adequate food, clothing and shelter. This they acknowledge. While both, nevertheless, express the hope to be able to do so in the near future, their past performance belies that hope. Their ability to supply those needs in the foreseeable future must be doubted when judged by their past performance.

We note, in addition, that other means made available to the Dameron parents through support services and supervision for the purpose of assisting them to gain the ability to provide for their children's minimal needs failed; moreover, this failure resulted from the Damerons' refusal to fulfill the reasonable expectations of their contract with Social Services.

Finally, we turn our focus to the best interests of the children. Their immediate interests plainly demand that they not be returned to the hazards of the environment from which they were removed;[4] their long-range interests will be best served by terminating the parent-child relationships and all parental rights, thereby affording the children the advantage of suitable adoption. The longer these children remain in foster care, the more difficult a suitable adoption becomes. We therefore cannot justify denying them a brighter future in the vague, if not fanciful, hope that their parents will some day soon attain marital stability, sobriety and gainful employment, such as would afford the means to supply their children's needs. The odds against achieving this are unfavorable; the risk in waiting is too great.

V. In concluding, we also note that the attorney who by appointment of the juvenile court has served throughout this proceeding as both the children's counsel and their guardian ad litem pursuant to section 232.113, The Code 1979, has joined in and adopted the State's brief and argument.

---

**4.** This answers in the negative the previously identified, corollary issue generated by subsection 232.102(6): whether a preponderance of evidence favors returning the children to their parents.

VI. This case is reversed and remanded with directions for entry of a decree consistent with this opinion.

REVERSED AND REMANDED.