# IN THE COURT OF APPEALS OF IOWA

No. 15-1338
Filed October 14, 2015

IN THE INTEREST OF J.T., I.T., AND M.T.,
Minor Children,

S.T., Mother,
Appellant.

_____

Appeal from the Iowa District Court for Polk County, Colin J. Witt, District Associate Judge.

A mother appeals the termination of her parental rights. **REVERSED AND REMANDED.**

Michael Horn of Kuntz, Laughlin & Horn, Des Moines, for appellant mother.

Thomas J. Miller, Attorney General, Kathrine S. Miller-Todd, Assistant Attorney General, John P. Sarcone, County Attorney, and Annie Fox Reynolds, Assistant County Attorney, for appellee State.

Daniel Rothman of McEnroe, Gotsdiner, Brewer, Steinbach & Rothman, P.C., West Des Moines, for appellee father.

Christopher Kemp of Kemp & Sease, Des Moines, attorney and guardian ad litem for minor children.

Considered by Doyle, P.J., and Mullins and Bower, JJ.

**DOYLE, Presiding Judge.**

A mother appeals the termination of her parental rights to her children, J.T., I.T., and M.T.[1]  She contends: (1) the State failed to prove the grounds for termination; and (2) the juvenile court should have declined to terminate her rights because (a) the children are in legal custody of a relative, (b) the ten-year-old child expressed a desire to be returned to his parents' care, and (c) the children are closely bonded with their mother.  Upon our de novo review, we conclude termination was not warranted.

### I.  Background Facts and Proceedings.

Following a July 23, 2015 hearing, the juvenile court entered an order terminating the mother's parental rights pursuant to Iowa Code section 232.116(1)(f) (2015) as to the two older children and (h) as to the youngest child.  Iowa Code section 232.116(1) paragraphs (f) and (h) are essentially the same but for the applicable age of the child and the amount of time the child has been out of the home.  *See* Iowa Code § 232.116(1)(f) ("The child is four years of age or older" and "has been removed . . . for at least twelve of the last eighteen months"), (h) ("The child is three years of age or younger" and "has been removed . . . for at least six months of the last twelve months").  Both paragraphs (f) and (h) require the State to prove, by clear and convincing evidence, "the child cannot be returned to the custody of the child's parents . . . at the present time."  *See id.* § 232.116(1)(f)(4), (h)(4).  It is this element that the mother challenges.

---

[1] The father's parental rights to the children were also terminated and are not at issue here, as he has not appealed

## II.  Scope and Standards of Review.

Our review of termination decisions is de novo.  *In re A.M.*, 843 N.W.2d 100, 110 (Iowa 2014).  We give weight to the juvenile court's findings, especially assessing witness credibility, although we are not bound by them.  *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010).  An order terminating parental rights will be upheld if there is clear and convincing evidence of grounds for termination under section 232.116(1).  *See id.*  Evidence is "clear and convincing" when there are no serious or substantial doubts as to the correctness of the conclusions of law drawn from the evidence.  *See id.*

In determining whether parental rights should be terminated under chapter 232, the juvenile court "follows a three-step analysis."  *Id.*  Step one requires the court to "determine if a ground for termination under section 232.116(1) has been established" by the State.  *Id.*  If the court finds grounds for termination, the court moves to the second step of the analysis: deciding if the grounds for termination should result in a termination of parental rights under the best-interest framework set out in section 232.116(2).  *Id.* at 706-07.  Even if the court finds "the statutory best-interest framework supports termination of parental rights," the court must proceed to the third and final step: considering "if any statutory exceptions set out in section 232.116(3) should serve to preclude termination of parental rights."  *Id.* at 707.

## III.  Discussion.

The State notes this is a difficult case.  We agree.  The children were removed from parental custody in April 2014 due to allegations of drug use by the parents in the home with the children and ongoing domestic abuse.  The

children were placed with their paternal aunt. The father's parental rights were terminated primarily because he did not seek adequate help for his substance abuse and anger issues leading to repeated incidents of domestic abuse against the mother. The mother took advantage of the services offered to her but continued to maintain her relationship with the father knowing that he was not participating in the services he needed to address his substance abuse and violence issues. By the time of the termination hearing, the only real concern was the mother's relationship with the father. A family safety, risk, and permanency provider testified "there was not really any parenting concerns" with the mother, but she was concerned about the mother's lasting relationship with the father. Asked about her concerns if the father were not around, in Antarctica for example, the provider answered:

> If he wasn't present, there wouldn't be any concerns. [The mother] addressed all her substance abuse concerns right from the start and knocked out all of her treatment right away. I don't think she missed any appointments in treatment, and hasn't really missed any therapy. She completed her parenting class. She's been on top of everything. It's just the relationship with [the father] that's been the concern.

The DHS social worker testified similarly. In recommending termination of the mother's parental rights, the worker testified:

> I support termination with regards to her, too. I don't believe these last 14, 15 months that she really has truly gained insight into her situation with [the father] and how their history of domestic violence and drug usage, how that really, truly impacts her children, or I feel like she would have addressed that earlier on in this case.

She saw no obstacle to the mother getting her children back, but for her relationship with the father. She testified that "if it was provable today that [the father] was out of the picture, [she] would have no additional reservations about

the safety of the kids with [the mother," agreeing the mother had "addressed her substance abuse . . . . My concern is just her relationships."

The mother testified the court's April 16, 2015 permanency order directing the county attorney to institute termination of parental rights proceedings was a "wake-up call" for her. That was the first time it was obvious to her that she had to choose between the father and her children. She testified the father moved out of her home April 16, 2015, and they had not lived together since. Besides seeing the father in passing at visitations with the children, the mother testified her only contact with the father after April 16, 2015, was to give him a total of three rides to the children's birthday parties and baseball games. She said she had no other contact with him because she did not "want anything to interfere with [her] chances of being not terminated with [her] children. It's not worth the risk." She said she intended to divorce the father and explained why she had not yet done so.

The juvenile court concluded:

In [the mother's] case, the unfortunate source of the adjudicatory harm to her sons which fulfils the final element of these termination grounds proceeds directly from their father, rather than her. [The mother] has done everything anyone has asked of her in regards to treatment and direct care of her children; by all reports she is strongly bonded to the children, cares for them deeply, and earnestly strives to satisfy their physical, mental, and emotional needs—further, these attempts are more than minimally adequate.
    This is not to say [or] imply that [the father] alone bears the total weight of the separation from and the harm to the children: both parents have continuously and actively participated in a cycle of domestic violence, drug use, and child neglect. The major difference is that when forcibly separated by government action, [the mother] becomes a capable parent—[the father] does not. However, this separation is just that: forced. Together, [the mother and father] have exposed their children to violence, neglect, and devastatingly dangerous drug abuse—each share in a

necessary portion of failure leading to the harms placed upon [the children].

[The mother] has been informed, repeatedly and to the point that she has become acrimonious regarding it, that her relationship with a man who is unwilling to participate in services is the "main reason" that reunification could not take place. Regardless of whether the conversations turned on the onus of [the father's] danger to the children, his lack of participation in services, or his re-emerged drug use and criminal involvement, [the mother] was on notice for at least a year that her relationship with [the father] was the core deficit—perhaps the only remaining direct deficit—in her ability to parent. It is entirely possible (though the court does not rest its conclusion on the issue) that [the mother and father] remain in contact even now at this late date, long after the State has activated the machinery of irrevocable separation. Regardless of if this is so, the extensive and invariant history of disastrous reunion between the two is sufficient enough to be reliably predictive: an inference case law commands this court to make. This clear and convincing inference is strengthened by the closeness of residence between [the mother and father's] family, the suspicious and collusive questioning of DHS professionals regarding how to demonstrate separation, [the father's] sudden residency with [the mother] in October-November 2014, and the refusal of the mother to sustain a civil no contact order, file for separation, or file for divorce with [the father]. Perhaps the most painful evidence is [the mother's] letter to the court which is part of exhibit record in these cases: It is obvious from reading that [the mother] loves her children dearly, and blames herself, stating that she "can never forgive herself" for this separation. Absent from this letter, however, is any awareness of the critical role that her relationship with [the father] has played in her continued separation from her children. This honest and heartfelt statement to the court contains, by notable absence, the fullest proof of the problem in this case.

Unfortunately, [the mother] has failed to adequately protect her children from their father. The court finds it is fatal to her capacity to parent and unlikely to change. It should be noted that the past behavior here is not the drug use, but the unshakable relationship with [the father]. Should it be only the drug use, the life changes of [the mother] in this case would buck such reliance on history.

(Internal citation omitted.)

To be sure, we share the juvenile court's concerns about the history of the relationship between the mother and the father. Certainly, a court can consider

past performance to gain insight into a parent's future parenting, *In re O'Neal*, 303 N.W.2d 414, 422-23 (Iowa 1981), but have we become so cynical that we do not believe a person can turn over a new leaf?  We think not.  Past performance is not an absolute predictor of the future; it only *may* be indicative of what the future holds.  *See In re R.M.*, 431 N.W.2d 196, 199 (Iowa Ct. App. 1988).

Some three months elapsed between the April 16 permanency hearing and the July 23 termination hearing.  The mother testified she terminated her relationship with the father after her "wake-up call" at the April permanency hearing.  In a July 7, 2015 letter to the DHS social worker, the mother's therapist stated:

> Since [the mother's] last court date, she reported cutting all ties with [the father].  I felt like she was really honest about her feelings.  She has a lot of frustration towards [the father] and really not wanting anything to do with him because his focus isn't their children.  I believe after court in April was a big wake-up call and it really hit [the mother].

We find no clear and convincing evidence in the record that the mother and father clandestinely resumed their relationship after April 16, 2015.  The fact that the mother gave the father three rides to family events is not enough.  The DHS worker testified she received a text message on April 29, 2015, from the mother's sister that somebody reported the father was back at the mother's home.  The sister had not personally seen the father there; somebody told her.  That "somebody" was not identified.  The DHS worker did not confront the mother with this information.  This "evidence" is far from clear and convincing.  And to the juvenile court's credit, it was not considered in reaching its decision.  There is

nothing more in the record other than suspicion, innuendo, and speculation by the State's witnesses. This is not clear and convincing evidence.

The juvenile court's termination was founded on the mother's relationship with the father: "the core deficit—perhaps the only remaining direct deficit—in her ability to parent." The court concluded "the extensive and invariant history" of the relationship between the two was "sufficient enough to be reliably predictive" that the two would continue a relationship in the future, thereby exposing the children to an adjudicatory harm for which they were originally removed from the home. We disagree. There is no clear and convincing evidence in the record that the mother and father continued their relationship after the April permanency hearing. Prior to that time, the mother's relationship with the father appeared unshakable. But we must take into account the mother's permanency hearing epiphany, when it finally became obvious to her that she had to choose between her children or the father. We can speculate that she did and will continue her relationship with the father, based upon their history, the closeness between the mother's residence and that of the father's family, and the fact that she had not yet filed for divorce from the father. Speculation is not enough. We are not so naïve to think there is no possibility the mother and father have continued some clandestine relationship, but it is the State's duty to prove by clear and convincing evidence that a relationship did continue and that because of the nature of the relationship, the children would be exposed to adjudicatory harm by the father if the children were returned to the mother's home. The State has not met its burden in this case.

For this reason, we reverse the juvenile court's order terminating the mother's parental rights to her children. We remand the case to the juvenile court for further proceedings consistent with this opinion. We need not address the mother's other arguments raised on appeal, nor do we retain jurisdiction.

**REVERSED AND REMANDED.**