# IN THE COURT OF APPEALS OF IOWA

No. 22-1466
Filed November 17, 2022

**IN THE INTEREST OF M.O.,**
**Minor Child,**

**M.O., Father,**
        Appellant**.**
_____

        Appeal from the Iowa District Court for Cherokee County, David C. Larson,

Judge.


        A father appeals the termination of his parental rights to his child.

**AFFIRMED.**


        Dean A. Fankhauser of Vriezelaar, Tigges, Edgington, Bottaro, Boden &

Lessman, L.L.P., for appellant father.

        Thomas J. Miller, Attorney General, and Ellen Ramsey-Kacena, Assistant

Attorney General, for appellee State.

        Lesley D. Rynell of Juvenile Law Center, Sioux City, attorney and guardian

ad litem for minor child.


        Considered by Bower, C.J., and Greer and Badding, JJ.

**BADDING, Judge.**

When this child was two years old, his father killed his mother and unborn baby sister in a drug-fueled car crash. The father went to prison, and the child was placed into the guardianship of his maternal grandfather. Close to six years later, the child was removed from the grandfather's care. This removal led to the end of the guardianship and termination of the father's parental rights. The father appeals. Though he agrees the statutory grounds for termination were met under Iowa Code section 232.116(1)(b) and (f) (2022), the father claims termination is not in the child's best interests. We disagree on our de novo review of the record.[1]

The story of the mother's death was told in an exhibit admitted into evidence at the hearing to terminate the father's parental rights. In March 2015,

> [w]itnesses said that they saw [the mother's] Chevy Blazer swerving all over the road; the windows were down and they could hear [the father] screaming at her, calling her [derogatory names]. The car was going 120 miles per hour when it hit a patch of water and began to skid off the road. It flipped three times before hitting a tree and finally coming to rest in the swampland at the side of the highway.

A witness saw the father emerge from the wreck, pulling the couple's two-year-old child out after him. He left the child by the side of the highway and tried to flee from the scene. A bystander climbed down to the car and found the mother, who was nearly nine months pregnant, "crushed under it. . . . She was still alive . . . but barely." Once the paramedics arrived, they could not save the mother or her

---

[1] In conducting our de novo review, we "give weight to the [juvenile court's] factual findings but are not bound by them." *In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022). While "[w]e generally apply a three-step analysis to review termination of parental rights," *id.*, we need only address the step raised by the father on appeal, that being whether termination is in the child's best interests. *See In re P.L*, 778 N.W.2d 33, 40 (Iowa 2010).

unborn child. The father was determined to have been driving, and his toxicity screen was positive for alcohol, methamphetamine, marijuana, and synthetic marijuana. Police later reported the father "was still so high and drunk as they drove him from the hospital to the police station that he kept laughing and cracking jokes and telling them to play him his favorite song."[2] The father had a history of drug and alcohol abuse, and his relationship with the mother was violent until the end.

The child was placed into the care of his maternal grandfather the night of the crash. They later moved to Iowa. The father was convicted of vehicular homicide and sentenced to prison in Louisiana, where the crash occurred, in 2017. He has had no contact with the child since then. While the father believed he would be released in early 2023, he acknowledged the child could "not be placed with [him] immediately" and "there would be a very lengthy transition."

Since this early trauma in his life, the child has suffered from mental-health issues and aggressive behavior. Because of the child's "difficulties with temper tantrums, meltdowns," defiance, and opposition, he has bounced from placement to placement, with none able to manage his behaviors. As a result, the child was living in a psychiatric medical institute for children (PMIC) at the time of the termination hearing in July 2022. Although a social worker thought the child remaining in State custody until he turns eighteen "could be a possibility," she pointed out that the child's psychiatric placement was an opportunity for him to be

---

[2] In his testimony at the termination hearing, the father downplayed his culpability—denying being intoxicated, arguing with the mother in the vehicle, or trying to leave the scene of the wreckage.

"somewhere that people won't give up on him" and "really work on the immense amount of trauma that he has been through in his life and work on his mental health and get to a stable point." So she was "hopeful that there is an adoptive home out there" that could provide the child permanency.

With this backdrop in mind, we turn to the father's best-interests challenge. In considering whether termination is in a child's best interests, we "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2).

> In this connection, we look to the child's long-range as well as immediate interests. Hence we necessarily consider what the future likely holds for the child if returned to his or her parents. Insight for this determination can be gained from evidence of the parent's past performance, for that performance may be indicative of the quality of the future care that parent is capable of providing.

*In re Dameron*, 306 N.W.2d 743, 745 (Iowa 1981).

The father argues termination is not in the child's best interests because he, "even though incarcerated, is the only relative for long-term placement for the minor child." In support of this argument, he highlights the child's ongoing behavioral issues and "multiple failed placements." The father assumes this means the child "will never experience a forever home and will remain in foster care for the remainder of his childhood." Based on that assumption, the father maintains the child's best interests require "allowing the minor child to remain in foster care" until his presumed release from prison in early 2023, which could be followed by "the institution of reunification efforts to reunify" the father and child.

We are not so hopeless for the child's future, though we acknowledge the father's concern that the child's behavioral and mental-health issues will continue to serve as obstacles to permanency. Those obstacles, however, are far outweighed by the impediments to reunification with the father. The goal of the child's current placement at a PMIC is to address the child's trauma and stabilize his mental health to help with his "out-of-control" behaviors. That goal would be upended by returning the child to the father, who was the source of the child's trauma, not to mention the various circumstances preventing reunification with the father. Those circumstances include the father's lack of relationship with the child, incarceration in a different state, and untreated substance-abuse and domestic-violence issues.

While the father does not rely on the exception in Iowa Code section 232.116(3)(d)—which authorizes the court to forgo termination when the child is placed "for care and treatment and the continuation of the parent-child relationship is not preventing a permanent family placement for a child"—the child's "placement in a PMIC d[oes] not change the termination equation," given that the father has no relationship with the child and no prospect for reunification in the near future. *In re S.O.*, 967 N.W.2d 198, 210 (Iowa Ct. App. 2021); *accord In re J.R. II*, No. 12-1239, 2012 WL 4903048, at *3 (Iowa Ct. App. Oct. 17, 2012). Under these circumstances, we find termination is in the child's best interests, as it will best provide for the child's safety and long-term growth, as well as his physical, mental, and emotional needs. *See* Iowa Code § 232.116(2); *see also In re J.B.L.*, 844 N.W.2d 703, 705–06 (Iowa Ct. App. 2014) (finding termination to be in child's best interests where father was incarcerated, had no relationship with the

child, could not resume care for four to six months at the earliest, and had a history of criminal behavior and alcohol and substance abuse); *see also In re R.R.*, No. 19-1849, 2020 WL 110450, at *1–2 (Iowa Ct. App. Jan. 9, 2020) (rejecting father's best-interests argument that "the children should wait for permanency while he . . . earns release from prison" and concluding termination was in children's best interest where father "maintained no relationship with the children since his incarceration"); *In re J.D.*, No. 19-1457, 2019 WL 5791046, at *3 (Iowa Ct. App. Nov. 6, 2019) (finding termination to be in child's best interests where parent had no relationship with child); *In re K.T.*, No. 16-0204, 2016 WL 2744784, at *2 (Iowa Ct. App. May 11, 2016) (same).

**AFFIRMED.**