**IN THE COURT OF APPEALS OF IOWA**

No. 21-1268
Filed June 15, 2022

**IN THE INTEREST OF N.C.,**
**Minor Child,**

**E.K., Guardian,**
          Petitioner-Appellant,

**D.C., Father,**
          Respondent-Appellee.
_____

Appeal from the Iowa District Court for Wapello County, William Owens, Associate Juvenile Judge.

A guardian appeals the dismissal of her petition to terminate parental rights under Iowa Code chapter 600A (2020). **REVERSED AND REMANDED WITH INSTRUCTIONS.**

Carly M. Schomaker of Gaumer, Emanuel, Carpenter & Goldsmith, P.C., Ottumwa, for appellant.

Cynthia D. Hucks of Box and Box Attorneys at Law, Ottumwa, for appellee.

Ryan J. Mitchell of Orsborn, Mitchell, Goedken, & Larson, PC, Ottumwa, attorney and guardian ad litem for minor child.

Heard by Bower, C.J., and Schumacher and Ahlers, JJ.

**BOWER, Chief Judge.**

A child's legal guardian appeals the juvenile court order dismissing her petition to terminate the parental rights of the father, D.C. The guardian, E.K., contends the father has abandoned the child and termination of his parental rights is in the best interests of the child. We reverse the juvenile court order and remand with instructions to enter an order terminating the parental rights of both parents.

**I. Background Facts & Proceedings.**

E.K. is the maternal grandmother of the child, N.C., and has been the child's primary caregiver since his birth in early 2017. E.K. became the child's temporary guardian in November 2017 and permanent legal guardian in May 2018 with the parents' consent. E.K. maintained the same residence from 2011 until February 2021, has had the same phone number since 2008, and has maintained her social media accounts. The father knew the location of the guardian's home and her phone number, and he had also contacted her via Facebook in the past.

The mother and father were in and out of a relationship from before the child's birth through June 2018. During that period, the father attended visits with the child, often set up through the mother, but sometimes he directly communicated with the guardian. The father's visits stopped when he left town for work in the summer of 2018. He returned to town permanently in December 2018 but made no attempt to contact the guardian or see the child until after the termination had been filed in September 2020. He said it was "weird" to contact the guardian and later thought "so much time had passed" since he had seen the child that he would not be welcome. The father's court-ordered child support payments are garnished from his wages.

After he returned to town, the father maintained some contact with the mother, but their relationship was "pretty rocky." The mother has mental-health issues, impacting her behavior with the guardian and the father over the years.[1] She admitted to having fights with the guardian when her behavior was out of control. She also admitted misleading the father about setting up a visit and challenging the guardianship. The mother threatened violence against "her ex" on social media in 2019, and the father ended contact with her. When asked if he contacted the guardian during 2019, the father said, "No. I kept my distance after the [mother's] death threats," indicating he believed she was serious.

The father married in 2019 and had a baby with his new wife; he adopted his wife's two young children in 2020. The father blocked most contact from the mother in 2019, and his new wife became the point of communication with the mother, primarily using a parenting app. Since 2019, the father has become "family friends" with the child's maternal grandfather and step-grandmother,[2] inviting them to the birthday parties of his children with his wife. The father purchased a Christmas gift for the child for Christmas 2019, and he left it with the child's grandfather.[3] When asked why he did not arrange to give the gift through the guardian, the father answered,

> I just didn't—At that point I did not feel like I was welcome to be a part of his life, you know, because it had been a while since—I mean, it had been a long time since I had actually been a part of his life. I

---

[1] The mother has maintained regular visits with the child and helps with his care. She testified termination of her and the father's parental rights and adoption by the guardian would be in the child's best interests.

[2] The guardian and grandfather divorced many years ago.

[3] There is no evidence the guardian knew of the gift, or whether it was given to the child. The child's grandfather testified he was told there were gifts from the father to the child, but he did not personally see them.

didn't—I at least wanted to buy him something. I was purchasing gifts for the other kids. I just felt that it was right to buy him something as well.

In January 2020, the father's wife and the child's mother arranged a video chat with the mother, the child, and the father's new family. In April, the mother said she was setting up a visit for the father with the child but cancelled it just before it was supposed to happen. The mother and father had discussed ending the guardianship—once in 2018, and again in 2020. No action was taken after either of those discussions.

The child has assorted developmental, behavioral, and medical issues. As a result, the child has frequent medical and therapy appointments. In the past, the guardian limited the contact of the child's grandfather's family after they ignored the child's dietary allergies, with the child suffering gastrointestinal results. The father and his wife expressed doubt to the child's guardian ad litem (GAL) that some of the medical issues existed or were serious, and the father opined some of the child's developmental and behavioral symptoms "could be just because he wasn't socialized enough throughout his childhood so far. . . . I haven't been around to know for myself." The father accepted—with significant doubts—the mother's accounts of the child's medical needs; he did not talk with the guardian, request any of the child's medical records, or let the guardian know about a hereditary disease in his family—a form of which the child was recently diagnosed with. The father expressed a willingness to learn how to care for the child and his special needs, but he also dismissed the hereditary disease as "not a real big deal" and admitted he had not educated himself about the disease.

On September 4, 2020, the guardian filed a petition to terminate the parental rights of both parents.  The mother consented to termination on the condition the father's rights were also terminated.  On September 23, the father was served with the petition and order setting the date and time of the hearing.  The court issued a second order on October 1, stating the parties could appear in person or via GoToMeeting (and providing the appropriate link).  The father was not served with the order regarding how to appear for the hearing—a service attempt was made at the same address and the affidavit of service attested to a diligent search, noting "Defendant avoiding service."  The father did not appear or attempt to call in to the termination hearing in October.[4]  The juvenile court found him in default and entered an order terminating his parental rights.  A month later, the father filed a motion to set aside default and vacate the termination.  After a hearing, the court granted the motion, finding it was not clear whether the father received adequate notice to appear for the hearing.[5]  The father requested visitation after the hearing on his motion to vacate the termination, which the guardian refused "because [the child] doesn't know [the father]" and his presence would just be confusing to the child.

Trial on the petition for termination of parental rights occurred on April 2, May 26, and June 3, 2021.

---

[4] In the period of time between service of the petition and the termination hearing, the father participated in a virtual hearing to adopt his wife's children at his attorney's office.

[5] The court's order noted the father "waited about two weeks after discovering his mistake to meet with his attorney."

When asked why she wanted to adopt the child instead of remaining as guardian, the guardian stated,

> I want this to end, being in court every single year. I want to be able to move forward and give him a stable home that we don't have to constantly keep doing this and having questions and looking over our shoulder, you know, because people are driving past my house all the time. I don't want to have to keep wondering, "When am I going to get ripped back into court again?" I want to have our family. I want this done and over with and move on.

The guardian listed a number of upcoming appointments for the child and stated she did not want the father at the appointments or to have visits at this point reiterating "[the child] doesn't know [the father]" and opining his presence would just be more confusing for the child if the termination went through.

The GAL submitted a report and recommendations to the court. The GAL expressed concern that during a home visit, the father and his wife "made light of the child's medical conditions" and thought the conditions were made up, but they had not contacted the child's medical providers. The GAL termed the father's contact with the child "sporadic at best" and opined "the father has not assumed the duties encompassed by the role of being a parent" and "has not demonstrated significant interest in being a parent to the child." The GAL recommended, "[I]t is in the best interests of the child that parental rights be terminated."

In its final ruling, the juvenile court concluded the guardian failed to establish abandonment or intent to abandon by the father based on the payment of child support and the mother's misleading and misdirecting actions to limit the father's contact with the child. The court determined a consistent schedule of visitation for the father to resume a relationship with the child was in the child's best interests. The court dismissed the guardian's petition, observing it was "simply an attempt to

permanently shut [the father] out of [the child]'s life while continuing to allow [the mother] to maintain a relationship with [the child].".  The guardian's subsequent motion to amend, enlarge, and reconsider was denied in August.  The guardian appeals.

## II. Standard of Review.

"Private termination proceedings under chapter 600A [(2020)] are reviewed de novo."  *In re B.H.A.*, 938 N.W.2d 227, 232 (Iowa 2020).  We give weight to the trial court's findings of fact, especially on the credibility of witnesses, but are not bound by them.  *Id.*

## III. Analysis.

> Termination proceedings under Iowa Code chapter 600A are a two-step process.  In the first step, the petitioner seeking termination must first show by clear and convincing evidence a threshold event has occurred that opens the door for potential termination of parental rights.  Once that threshold showing has been made, the petitioner next must show by clear and convincing evidence termination of parental rights is in the best interest of the child.

*In re Q.G.*, 911 N.W.2d 761, 770 (Iowa 2018) (internal citations omitted).  The guardian challenges the juvenile court's ruling on both steps.

**Abandonment.**

Iowa Code chapter 600A authorizes the juvenile court to terminate a parent's rights if the parent has abandoned the child.  Iowa Code § 600A.8(3).  Abandonment of a child occurs when "a parent . . . rejects the duties imposed by the parent-child relationship, . . . which may be evinced by the person, while being able to do so, making no provision or making only a marginal effort to provide for the support of the child or to communicate with the child."  *Id.* § 600A.2(20).  The

legislature explained further: a parent is deemed to have abandoned a child six months of age or older,

> unless the parent maintains substantial and continuous or repeated contact with the child as demonstrated by contribution toward support of the child of a reasonable amount, according to the parent's means, *and* as demonstrated by any of the following:
> (1) Visiting the child at least monthly when physically and financially able to do so and when not prevented from doing so by the person having lawful custody of the child.
> (2) Regular communication with the child or with the person having the care or custody of the child, when physically and financially unable to visit the child or when prevented from visiting the child by the person having lawful custody of the child.
> (3) Openly living with the child for a period of six months within the one-year period immediately preceding the termination of parental rights hearing and during that period openly holding himself or herself out to be the parent of the child.

*Id.* § 600A.8(3)(b) (emphasis added). Thus, to avoid a finding of abandonment, the parent must both provide a reasonable amount of support *and* maintain contact with the child or guardian. *Id.*

The juvenile court found the father's court-ordered support payments were not unreasonable and the financial factor of abandonment had not been shown. The guardian does not contest this factor. The father made his court-ordered child support payments, meeting the first element of "substantial and continuous or repeated contact with the child." *See id.* § 600A.8(3)(b) (requiring "repeated contact with the child as demonstrated by contribution toward support of the child of a reasonable amount").

Proceeding to the actions prong, the court found,

> There is no dispute in the record [the father] did not live with [the child] for a period of six months within the one-year period immediately preceding the termination of parental rights hearing. There is also no dispute [the father] did not visit [the child] at least

monthly in the last two years, and nor did he communicate regularly with [him] during that time.

The court then examined the father's communications with the mother and his reliance on her to facilitate his contact with the child. While the court found the father could have done more to see the child—including initiating an action to modify the guardianship—it found his actions "were not unreasonable" in light of the guardian's limits on the mother's and child's grandfather's visitation.

Yet, on our de novo review, we find after June 2018, the father did not perform any of the statutory actions that would suggest he sought actual contact with the child. By his own admission he did not visit the child, have regular communication with the child or the guardian, or openly live with the child within a year preceding the termination hearing. *See id.* § 600A.8(3)(b)(1)-(3). The father does not contend the guardian prevented him from visiting or communicating with the child or that he was physically or financially unable to visit the child. *See id.* § 600A.8(2)(b). And he knew the guardian had custody of the child and where and how to contact her. We conclude clear and convincing evidence establishes the elements of abandonment under section 600A.8(3)(b).

The father asserts his subjective intent was to be a parent to the child and his intent was supported by his actions. A parent's subjective intent alone "does not preclude a determination that he parent has abandoned the child." *Id.* § 600A.8(3)(c); *see In re G.A.*, 826 N.W.2d 125, 130 (Iowa Ct. App. 2012) ("Although the father asserts an interest in G.A., the legislature has specifically directed that a subjective interest in the child, 'unsupported by evidence of acts specified in paragraph "a" or "b" [monthly visitation and regular communication]

manifesting such intent, does not preclude a determination that the parent has abandoned the child.' Parental responsibility demands 'affirmative parenting to the extent it is practicable and feasible under the circumstances.'" (alteration in original) (internal citations omitted));[6] *see also In re B.G.B.*, No. 19-1403, 2020 WL 4201004, at *4 (Iowa Ct. App. July 22, 2020) ("[S]ection 600A.8(3)(c) does not prohibit the court from considering a parent's intent; it only prohibits the court from determining that a parent has not abandoned a child based solely on the parent's subjective intent without taking the parent's acts into account."). "In making [its] determination, the court shall not require a showing of diligent efforts by any person to encourage the parent to perform the acts specified in paragraph 'a' or 'b.'" Iowa Code § 600A.8(3)(c).

The question of abandonment comes down to whether the father's interactions with the mother are sufficient to manifest his subjective intent to maintain a substantial and continuous place in the child's life or if he made "only a marginal effort . . . to communicate with the child. *See id.* §§ 600A.2(20), 600A.8(3).

Over the years of the guardianship, the mother sometimes exaggerated the degree to which she had care of the child and led the father to believe she would facilitate his contact with the child. But the father stopped all contact with the mother for eight months in 2019, blocking communications with her on social media platforms, and after that leaving almost all contact with the mother to occur via his wife. He had direct contact with the child's grandfather—including inviting

---

[6] *See G.A.*, 826 N.W.2d at 128 n.3 (examining a legislative change in the intent requirement).

him to birthday parties for his new children—but he never tried to contact the guardian for information about the child, to talk with the child, or to arrange a visit.

The father maintained contact with the mother because of the child. He believed he had provided a gift for the child for Christmas 2019 and the child's 2020 birthday. He had a brief video chat with the child in January 2020 while the child was visiting the mother. He made arrangements with the mother to visit the child in person, and they discussed starting the process to end the guardianship. The juvenile court found these efforts reasonable in light of his characterization of the relationships between the guardian, the mother, and the child's grandfather.

But, most of the actions cited as proof of continued interest were initiated by the mother—the father took minimal affirmative action of his own to be a part of the child's life, much less "maintain[ ] substantial and continuous or repeated contact with the child." *See* Iowa Code § 600A.3(b). When he received notice of the termination petition, he took no action until weeks after the termination hearing—not calling the guardian to ask any questions, not notifying his attorney of the petition (though he met with the attorney during the relevant period to adopt his wife's children), avoiding service for the order on how to appear, not appearing at the hearing, and then waiting thirty days before asking to set aside the default order.

"[P]arental responsibilities include more than subjectively maintaining an interest in a child. The concept requires affirmative parenting to the extent it is practical and feasible in the circumstances." *In re Goettsche*, 311 N.W.2d 104, 106 (Iowa 1981). While he may have been interested in the child, we find the father's meager efforts to demonstrate his parental responsibilities and maintain a

place in the child's life are insufficient. The guardian showed abandonment by clear and convincing evidence for termination under section 600A.8(3)(b). The guardian has met the threshold requirement for private termination. *See Q.G.*, 911 N.W.2d at 770.

**Best Interests.** Because a ground for termination has been established, we must next determine if termination of the father's parental rights is in the child's best interests. *See id.* The child's best interests is our "*paramount consideration*" in the private termination of parental rights, but the parents' interests are also "given due consideration." *B.H.A.*, 938 N.W.2d at 232.

For private termination proceedings,

> The best interest of a child requires that each biological parent affirmatively assume the duties encompassed by the role of being a parent. In determining whether a parent has affirmatively assumed the duties of a parent, the court shall consider, but is not limited to consideration of, the fulfillment of financial obligations, demonstration of continued interest in the child, demonstration of a genuine effort to maintain communication with the child, and demonstration of the establishment and maintenance of a place of importance in the child's life.

Iowa Code § 600A.1(2). We also consider "the child's 'physical, mental, and emotional condition and needs' and the 'closeness of the parent-child relationship.'" *Q.G.*, 911 N.W.2d at 771 (quoting Iowa Code § 232.116(2)-(3)). "[W]e look to the child's long-range as well as immediate interests" in light of the parent's past performance and ability to provide the child with a safe, stable home. *B.H.A.*, 938 N.W.2d at 233 (quoting *In re Dameron*, 306 N.W.2d 743, 745 (Iowa 1981)).

The guardian cites as reasons termination is in the child's best interests the lack of a relationship between the father and the child, the father's lack of

knowledge of and doubts expressed about the child's medical conditions, the child's struggle with change, and the benefit of permanency for the child. The father again notes the mother's behavior and defers to the juvenile court's analysis.

Considering the statutory factors of section 600A, we recognize the father did fulfill his court-ordered financial obligations. He also demonstrated minimal continued interest in the child as demonstrated by maintaining some contact with the mother. *See* Iowa Code § 600A.1(2). However, the father falls short on the factors where he would demonstrate a "genuine effort to maintain communication" or establishing and maintaining an important place in the child's life. *See id.* The mother, his wife, and the child's grandfather have at times each been the driving force behind his efforts to assume a role in the child's life, not his own interest.

Our evaluation of the child's needs and the parent-child bond also does not weigh in the father's favor. The father has expressed disbelief about the child's medical and behavioral conditions without seeking any firsthand knowledge or asking questions of the guardian or any treating professionals. He has shown little interest in discovering and addressing the child's needs. The father has no emotional bond or connection with the child. Termination of the father's rights is in the child's best interests.

Considering the mother's consent to termination of her parental rights if the father's rights are terminated, we reverse and remand with instructions to enter an order terminating the parental rights of both parents.

**Attorney Fees.** The father requests payment of attorney fees on appeal. Iowa Code section 600A.6B governs the payment of attorney fees in a private termination action, but only applies to appointed counsel and does not mention

private counsel. "Only those costs or attorney fees authorized by statute are taxable." *In re R.S.N.*, 706 N.W.2d 705, 708 (Iowa 2005). Father's counsel is privately retained, not appointed, and therefore the attorney fee statute does not apply.

**REVERSED AND REMANDED WITH INSTRUCTIONS.**